THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MAX PETROVIC, Defendant-Appellant.

First District (5th Division)    No. 80-1899

Opinion filed November 6, 1981.—Rehearing denied January 6, 1982.

Thomas J. Organ, of Carey, Cisco & Organ, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Sharon Eiseman, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a bench trial, defendant was convicted and sentenced to six years for armed violence and a concurrent three year term for aggravated battery. On appeal, it is contended that (1) defendant was not proved guilty beyond a reasonable doubt; (2) the trial court erred in failing to grant defendant a continuance to obtain a necessary witness, in failing to grant an evidentiary hearing on his motion for rehearing of his motion for new trial, and in allowing testimony as to a telephone conversation; and (3) defendant was improperly sentenced.

The record discloses that on the date set for trial defendant moved for a continuance because a necessary witness was purportedly hospitalized. In denying the request, the court stated that, if necessary, it would give defendant another day to bring in his witnesses.

Thomas Jackson testified that on July 25, 1979, about 11 p.m., he and 15 to 20 others were in Horner Park, celebrating a friend's birthday, when the passenger on a passing motorcycle yelled certain remarks and obscenities and Jackson and his friends yelled back at them. He stated that the park was well-lighted and that the slowly moving motorcycle came within 15 to 20 feet of him, but that he was unable to describe the motorcycle or to identify either man except that the driver had dark hair and was wearing dark pants and the passenger also had dark hair, dark pants, and a dark tank top. Jackson and Thomas Okienowski followed them in a car and, after the motorcycle made a right turn onto Montrose and a left turn onto Manor, it pulled up on the sidewalk and, when the passenger got off, Okienowski suggested that they probably had a gun and they decided to leave. About two blocks from where they had last seen the motorcycle, he (Jackson) was shot in the head near his right eyebrow. He testified that he heard four shots altogether and that he is blind in one eye as a result of one of the shots.

Richard Sheldon testified that he was with a group in Horner Park about 11 p.m. on July 25 when two persons on a passing motorcycle yelled at them. The motorcycle came within seven feet of him, and he was able to clearly see the people on it because the park lights were on. He had seen the passenger several times before, on his way to school, and he identified defendant as the passenger in a lineup the next day and again at trial.

Thomas Okienowski testified that he was also in the park about 11 p.m. on July 25 when two people passing on a motorcycle yelled certain things to his group. At that time, he was about five feet from the slowly moving motorcycle in an area lighted with street lights. Okienowski had seen the passenger around school and knew him as "Little Hugo." He and Jackson got in Jackson's car and followed it to show them that they were

not afraid. The motorcycle turned right on Montrose and then turned again on Manor and, when the passenger started to get off the bike, he said that they might have a gun—to which Jackson responded, "Well, we better get out of here." They passed the motorcycle and, after they had turned around and began driving in the opposite direction on Montrose, he heard a shot and saw Jackson bleeding from above the eye. He turned and saw the motorcycle and heard another shot. Two people were on the motorcycle and the passenger had a black handgun and was shooting at them, firing four or five shots. He said that the closest they got to the motorcycle while following it was 10 to 15 feet and that it was a silver Honda 750, the same one he had seen in the park. He made a photo identification the next day and also identified defendant in the courtroom as the passenger on the motorcycle.

The defense called Patricia Cunningham, who stated that she had known defendant for four to five years and had been with him and other friends from about 8 p.m. to 10 p.m. on July 25. When she first saw defendant it was at Roosevelt School, and he was with his girl friend, Frank Shockey, and Robert Taylor. Later, they all left and went to a store at Central Park and Wilson, a usual meeting place, from which defendant left about 10 p.m. to drive his girl friend home in Frank Shockey's car. When she next saw him about 10:30, he was back at Central Park and Wilson with Shockey, Robert Taylor, Michael Mihaus, and two sisters named Roxanne and Carrie. She left about 11 p.m., and defendant was still there. She also stated that defendant was wearing gray khaki pants and a white sleeveless T-shirt and that none of the people present that evening had motorcycles with them. She admitted talking to an assistant State's Attorney over the telephone the next day but denied telling him that the last time she had seen defendant on July 25 was at 5:30 p.m.

Roxanne Whited testified for the defense that she saw defendant and others in front of her house on Central from about 10 p.m. to 12:30 a.m. on the evening of July 25; that defendant was there around 11 p.m. when she called her sister Carrie in, and that none of those present had motorcycles.

Frank Shockey testified for the defense that he arrived at Central and Wilson about 8:30 p.m., that evening and that at about 9:30 p.m. defendant left for about 40 minutes to take his girl friend home, but that defendant did not leave again until midnight. Shockey said that defendant was wearing dark baggy pants and a white Dago T-shirt and that he thought Mike Mihaus had his bright orange Kawasaki motorcycle at Central and Wilson that evening.

Defendant testified that at 8:30 or 9 p.m. on July 25, he went alone to Central Park and Wilson. Many friends were there, including Frank Shockey, Mike Brouer, Patsy and Roxie. He was wearing a white sleeveless T-shirt and light-colored khakis. Defendant denied leaving on a

motorcycle of any kind, going to Horner Park, having a gun or access to a gun, or firing shots at a car driven by Thomas Jackson. He testified that he had seen Jackson only once before and had no reason to quarrel with him and, although he had seen Richard Sheldon at Roosevelt School, he never had an argument with him. He testified also that he and Okienowski used to go to school together, that "we used to be fairly decent friends. We always talked. Basically, we used to sit right next to each other in Draft Shop" and that nothing had ever occurred between them to cause Okienowski to make his accusations.

William Kopec, an assistant State's Attorney, testified in rebuttal that on the day after the shooting defendant told him he was with Patsy Cunningham from early evening to midnight on July 25 and with Frank Shockey from 8:30 to 11 p.m. Kopec said he then called the telephone number for Patsy Cunningham by either looking in the telephone book or by using a number given him by someone from her place of employment. The person answering identified herself as Patsy Cunningham and told him that the last time she had seen defendant on July 25 was about 5:15 p.m.

The court denied defendant's motion for a new trial and found him guilty of armed violence and aggravated battery, "causing great bodily harm to Thomas Jackson by shooting him in the head with a firearm."

Opinion

Defendant first contends that his guilt was not proved beyond a reasonable doubt, arguing that the testimony of Thomas Okienowski was inconsistent and illogical and that his alibi testimony was corroborated by three witnesses.

We note initially that in a bench trial the credibility of witnesses, the weight to be given to their testimony, and the inferences which may be made therefrom are for the trial court (*People v. Pride* (1959), 16 Ill. 2d 82, 156 N.E.2d 551; *People v. Mays* (1980), 81 Ill. App. 3d 1090, 401 N.E.2d 1159), and the reviewing court will not reverse a conviction unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513). Moreover, the testimony of a single witness as to the identification of the accused will suffice to support a conviction where the witness was credible and made a positive identification, even though his testimony is contradicted (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631), and such testimony is strengthened to the extent of any prior acquaintance with defendant (*People v. Lumpkin* (1975), 28 Ill. App. 3d 710, 329 N.E.2d 262). Furthermore, where a positive identification has been made,

precise consistency on collateral matters is not necessary to establish guilt beyond a reasonable doubt, and the credibility of an eyewitness is not destroyed by minor discrepancies. *People v. Mays* (1980), 81 Ill. App. 3d 1090, 401 N.E.2d 1159.

Here, Thomas Okienowski testified he twice observed defendant— first, when he was only five feet from the motorcycle as it was driven by him in the well-lighted park, at which time he recognized the passenger as defendant, whom he knew around school as "Little Hugo." That he knew defendant is supported by the latter's testimony that he and Okienowski used to be "fairly decent friends," and that they always talked and sat next to each other in a class at school. Okienowski also testified that after Jackson was shot, he saw the motorcycle and the passenger shooting at them. Defendant was identified as the passenger by Okienowski in a photo identification the next day and also at trial.

Several inconsistencies in Okienowski's testimony are pointed out by defendant, but we do not believe that they were such as to render his testimony improbable or unsatisfactory. Other than some confusion as to which direction he and Jackson turned onto Manor while chasing defendant and as to whether it was dark or light at the site of the shooting, all other aspects of his testimony are corroborated by the testimony of Sheldon and Jackson. Furthermore, Sheldon, who was only seven feet from the motorcycle in the park, also recognized the passenger as someone he had seen several times before on his way to school and identified defendant in a lineup as the passenger.

Little significance should be attached to defendant's argument that Okienowski's failure to inform the police at the scene that he knew defendant seriously affects his credibility, as it appears that Okienowski did mention "Little Hugo" to the police a short time later while at the hospital with Jackson.

■■ While defendant's testimony that he was elsewhere on the evening in question was corroborated by three witnesses, the trier of fact is not required to accept alibi testimony even if presented by a greater number of witnesses. (*People v. Setzke* (1961), 22 Ill. 2d 582, 177 N.E.2d 168; *People v. Horobecki* (1977), 48 Ill. App. 3d 598, 363 N.E.2d 1.) The witnesses giving this testimony were all good friends of defendant and, in addition, the testimony of defendant and Patricia Cunningham that she was with him that evening was contradicted by that of the assistant State's Attorney, who said that she told him she had last seen defendant on July 25 at 5:15 p.m. In light thereof, we are unable to say that defendant's guilt was not proved beyond a reasonable doubt.

Defendant next asserts error in the failure of the court to grant him a continuance to obtain the testimony of a necessary witness pursuant to section 114—4 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat.

1979, ch. 38, par. 114—4). A motion for a continuance may be made when a material witness is unavailable, but whether a continuance is granted or denied depends on the particular facts and circumstances surrounding the request. (*People v. Arndt* (1972), 50 Ill. 2d 390, 280 N.E.2d 230.) Such motions are addressed to the sound discretion of the trial court (Ill. Rev. Stat. 1979, ch. 38, par. 114—4(e); *People v. Rivera* (1978), 64 Ill. App. 3d 49, 380 N.E.2d 1018), and are considered in light of whether failure to grant a continuance impeded preparation of his defense or prejudiced his rights (*People v. Solomon* (1962), 24 Ill. 2d 586, 182 N.E.2d 736, *cert. denied* (1962), 371 U.S. 853, 9 L. Ed. 2d 87, 83 S. Ct. 94; *People v. Harris* (1981), 95 Ill. App. 3d 1, 419 N.E.2d 489).

Here, on the date set for trial, counsel for defendant requested a continuance, stating that he was informed by defendant earlier that morning that Yung Kil Park, a witness essential to the defense, was hospitalized and that without him "we would be in a very bad posture proceeding in this matter." The State responded that it had four witnesses ready and that the case had been set with subpoenas on prior occasions. The following colloquy then took place:

"COURT: Well, then, why couldn't we proceed? As long as the State is to—if your intention is to have a trial by the Court, let the State put on their witnesses and we don't have to try it all in one day, so we can give you a date to bring in your—if it requires putting on any defense witnesses, and you intend to do that, and if you have to bring in anyone we'll give you another day.

ZIMMERMAN [defense counsel]: The only objection I have to this procedure, Judge, it's not just in this particular case but I found out from procedure that invariably I learned that I find out something from another witness on cross-examination that I don't—

COURT: Well, if that happens I'll let you go on."

■■ The record reflects that no offer of proof was made at that time as to the testimony of the witness; that no written motion or supporting affidavit was filed pursuant to section 114—4(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 114—4(a)); and that no statement or showing was made that the refusal of a continuance interfered with the preparation of the defense or otherwise prejudiced defendant's rights. Moreover, the failure to make an offer of proof prevented the State from stipulating to his testimony, as provided in section 114—4(b)(3) (Ill. Rev. Stat. 1979, ch. 38, par. 114—4(b)(3)). Under these circumstances, we find no abuse of discretion in the failure to grant a continuance.

Defendant next asserts that the trial court erred in failing to grant him an evidentiary hearing on his motion for rehearing of his motion for new trial based upon newly discovered evidence. According to *People v.*

*Baker* (1959), 16 Ill. 2d 364, 374, 158 N.E.2d 1, 6, the rule in evaluating newly discovered evidence is as follows:

"To warrant a new trial, the new evidence must be of such conclusive character that it will probably change the result on retrial, that it must be material to the issue but not merely cumulative, and that it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence."

Whether to grant or deny a motion for a new trial based on newly discovered evidence is discretionary with the trial court whose ruling will not be disturbed on review absent a showing of manifest abuse. *People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288.

Defendant grounds his motion for a new trial on information allegedly discovered and obtained (a) from an alibi witness (Yung Kil Park) who would testify that he and defendant were together on the evening of July 25 from 8:30 p.m. until 12:15 a.m. and were nowhere near the vicinity of the shooting and (b) from another witness (Rita Jamina) who purportedly would testify that the real offender had indicated to her on the date of sentencing that he was letting defendant take the "rap" for him.

In applying the standards set forth in *People v. Baker*, we are of the opinion that the trial court did not manifestly abuse its discretion on this issue. Initially, we note that the proposed testimony of Yung Kil Park is cumulative and would not likely have changed the result on retrial since defendant had already presented three alibi witnesses at trial. (See *People v. Mitchell* (1978), 60 Ill. App. 3d 598, 376 N.E.2d 1036, *cert. denied* (1979), 440 U.S. 916, 59 L. Ed. 2d 466, 99 S. Ct. 1233.) Furthermore, it appears that his testimony was not newly discovered evidence since the absence of the witness was the basis of the request for a continuance prior to trial and, although defendant was told he would be given the opportunity to call the witness on a later date, the record discloses that he failed to do so.

■■ The purported testimony of Rita Jamina is hearsay concerning which, as the trial court recognized, "It has long been the general rule that 'extrajudicial declarations of a third party, not made under oath, that he committed the crime, are purely hearsay, and even though they are declarations against interest, are inadmissible' *(People v. Lettrich* (1952), 413 Ill. 172, 178, 108 N.E.2d 488, 491.)" *(People v. Black* (1980), 80 Ill. App. 3d 116, 120, 399 N.E.2d 647, 650.) However, the supreme court stated that this rule should not be applied mechanically and suggested that four factors be considered in determining the trustworthiness of the third-party declaration. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.) Those factors are whether the statement

was made in a spontaneous manner to a close acquaintance a short while after the crime; whether the statement was corroborated by other evidence; whether the statement was, in fact, against the declarant's interest; and whether the declarant was available for cross-examination. (410 U.S. 284, 300-01, 35 L. Ed. 2d 297, 311-12, 93 S. Ct. 1038, 1048-49.) Illinois courts have excluded statements as hearsay where any one or more of these factors has been absent. (*People v. Foster* (1978), 66 Ill. App. 3d 292, 383 N.E.2d 788.) Here, there was no representation that the declarant was or would be available for cross-examination, and there was no assertion that it was made spontaneously shortly after the crime; in fact, it was apparently made quite some time after the crime. Additionally, it was also not corroborated by other evidence. We are of the opinion, therefore, that the trial court did not abuse its discretion in the refusal of an evidentiary hearing on the motion to reconsider.

■■ Defendant also argues that a proper foundation was not established for the telephone conversation between Patricia Cunningham and assistant State's Attorney, William Kopec. "The rule is that telephone conversations, the substance of which is relevant and material to the issues, are competent provided the identity of the person with whom the conversation was had is established by direct evidence or facts and circumstances." *People v. Nichols* (1941), 378 Ill. 487, 490, 38 N.E.2d 766, 767.

■■ Assistant State's Attorney Kopec testified in rebuttal that defendant told him he was with Patricia Cunningham from early afternoon until midnight on the evening of the shooting. Although defendant did not know her telephone number, he told Kopec where she worked. Kopec called that restaurant and then called her home number by using a number he got either from the restaurant or by looking up a Cunningham that lived on the street where she was supposed to live. He said that the person who answered the telephone identified herself as Patricia Cunningham and told him she knew Max Petrovic and had seen him the day before. Patricia Cunningham had previously testified to a conversation with an assistant State's Attorney who called her on the telephone at home on the evening of July 26, 1979. In light thereof, we believe a sufficient foundation was laid for the telephone conversation.

Defendant also suggests that the admission of the telephone conversation constituted grave error because there was confusion with respect to which dates the parties were referring. He specifically calls attention to the following answer by William Kopec as it appears in the record:

> "A. I asked her if she saw Max Petrovic or was with Max Petrovic one day before the 25th of July, 1979 * * *."

We find no merit in this assertion since the date of the conversation and of the shooting had already been clearly established at the beginning of Kopec's testimony and because it is unclear whether a comma ought to

have been inserted in the record after the word "before" to reflect the fact that Kopec was referring to the conversation of July 26.

Defendant's final contention is that the imposition of the sentence for armed violence was improper. Defendant relies on the recent Illinois Supreme Court decision, *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627, which prohibited double enhancement under the armed violence statute.

Armed violence is defined as the commission of a felony while armed with a dangerous weapon (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2), and section 12—4(b)(1) of the Criminal Code of 1961 provides that a person who uses a deadly weapon in the commission of a battery commits aggravated battery (Ill. Rev. Stat. 1979, ch. 38, par. 12—4(b)(1)).

At the close of the trial, the court concluded that it was not satisfied beyond a reasonable doubt that there was an attempt to kill but was convinced that defendant was guilty of the crime of aggravated battery, "causing great bodily harm to Thomas Jackson by shooting him in the head with a firearm" and that he was guilty of armed violence in that defendant, "while armed with a dangerous weapon, intentionally and knowingly without legal justification caused bodily harm to Thomas Jackson by shooting him with a firearm." In the court's order of sentence and commitment, the two counts of aggravated battery were merged and defendant was sentenced to six years for armed violence and a concurrent three years for aggravated battery.

■■ Initially, it appears that the trial court correctly merged the aggravated battery count based on great bodily harm (par. 12—4(a)) into the aggravated battery count based on use of a deadly weapon (par. 12—4(b)) in sentencing defendant. The shot which blinded Thomas Jackson was the same shot which served as the basis for both counts of aggravated battery and, furthermore, the count of aggravated battery based on great bodily harm also resulted from the use of the deadly weapon.

In *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627, the defendant was charged with armed violence, the underlying felony of which was aggravated battery based on use of a deadly weapon. In reviewing the language of the armed violence statute, the court concluded that the General Assembly did not intend that the presence of a weapon should serve to enhance a misdemeanor to a felony and also serve as the basis of a charge of armed violence. It concluded, therefore, that the armed violence statute requires a predicate offense which is a felony without enhancement through the presence of a weapon and, consequently, dismissed the armed violence count.

■■ In this case, as in *Haron*, the enhancement of the offense of battery to aggravated battery was based on the use of a deadly weapon, and the

presence of the weapon also served as the basis for the armed violence charge. Thus, the armed violence conviction and sentence imposed thereon was improper.

With regard to sentencing, defendant also contends that the armed violence statute is unconstitutional. In the instant case, because we have found that defendant was improperly convicted under the statute, it will not be necessary to address the constitutionality question.

For the reasons stated, defendant's conviction for armed violence is reversed and his sentence vacated, and the conviction and sentence for aggravated battery is affirmed.

Affirmed in part; reversed in part.

LORENZ and WILSON, JJ., concur.