THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LARRY DAVIS, Defendant-Appellant.

First District (5th Division)   No. 85—0952

Opinion filed September 19, 1986.

PINCHAM, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Gregory W. O'Reilly and
Bob Isaacson, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Paula
M. Carstensen, and Terrence J. Griffin, Assistant State's Attorneys, of
counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:
Defendant, Larry Davis, was convicted of armed robbery and ag-

gravated battery after a bench trial and was sentenced to 15 years' imprisonment for armed robbery and to 5 years' imprisonment for aggravated battery. Defendant now appeals raising only two contentions: (1) that the trial court abused its discretion in denying his request for a continuance and (2) that the mittimus and notice of appeal must be amended to conform to his sentence.

The record indicates that on September 7, 1984, at approximately 5:15 p.m. the victim, Lucille Elliott, was traveling on an eastbound CTA train on the west side of Chicago. The victim testified that she was alone in the car when two black males entered the car, walked passed her and sat down behind her. She described one man, later identified as defendant, as dark complected, 5 feet 5 inches to 5 feet 7 inches tall and weighing between 125 and 130 pounds; she described the second man as light complected and over 6 feet tall. Moments later, defendant came up behind the victim and hit her on the back of the head with a blunt object. She turned to see the second man, holding a gun, who told her not to scream or he would kill her. He then took her two diamond rings, a pair of boots and her purse. As defendant's companion ordered the victim to lie on the floor and instructed defendant "if she moves, kill her," defendant sprayed Mace in her face. The men then fled at the train's next stop. Moments later, a man entered the car and, observing the victim on the floor, asked her if she was hurt. When she explained what had happened, the man sought assistance from a conductor in the next car. The man and the conductor then helped the victim to get off the train and into a waiting ambulance.

Rosalind Banfield testified that she was riding on the same train as the victim but was seated in an adjacent car. She noticed that the victim was sitting alone and observed two men, whom she described as disruptive, pass through her car and enter the victim's car. Her description of the two men was substantially similar to the victim's. A short time later, she observed another man pass through her car and enter the victim's car, then return immediately and approach the conductor. As these two men reentered the victim's car, Ms. Banfield followed them and there observed the bleeding victim lying on the floor. Ms. Banfield later went in an ambulance with the victim to the hospital.

Paramedic Joseph Hogan testified that as he drove the victim and Ms. Banfield to the hospital, he observed defendant standing on a street corner with two other men; defendant matched the description given to him by the two women as one of the offenders. Hogan pulled up to the corner and asked the women if they could identify defend-

ant and both women did so. Approximately one block later, Hogan encountered a police car on patrol and related the previous incidents. Returning to the corner with police, the victim and Ms. Banfield again identified defendant. Later that evening, both the victim and Ms. Banfield identified defendant at a police lineup.

On the first day of trial, February 20, 1985, at the close of the State's case, defense counsel requested a continuance in order to contact an alleged alibi witness. The case was continued until the following day at which time defense counsel requested a second continuance. A four-day continuance was granted by the court, but counsel was instructed that no further continuances would be granted. When the trial reconvened, counsel told the court that he had spoken to the witness, James Bryant, who would be present that morning, but as of 11:15 a.m., the witness did not appear in court. Counsel then requested a third continuance but the court noted that defendant had demanded trial six weeks previously on January 16, and that two prior continuances had produced no results; the court then denied counsel's request. Counsel did not indicate when the witness would be available. Counsel then made an offer of proof to the potential content of Bryant's testimony in which he would reportedly state that he was with defendant on September 7 from 2:30 p.m. until the time of his arrest. As they stood on a street corner that evening, a third man commented to them about a passing ambulance. Moments later, the ambulance returned and the injured person therein identified the third man as her assailant. All three men were then taken into custody by police, and at a lineup held later that evening, defendant was identified as the offender.

At the close of this offer of proof and after closing argument, defendant was found guilty of armed robbery and aggravated battery. In his motion for a new trial, defendant claimed error in denying his motion for a continuance but did not indicate the availability of the missing witness or his reasons for not appearing.

## I

■ Defendant's first contention on appeal is that the trial court abused its discretion in denying his request for a continuance in order to bring his sole alibi witness before the court. It is settled that a motion for a continuance to procure a witness is directed to the sound discretion of the trial court; its disposition will not be disturbed on appeal without a showing of a clear abuse of discretion. (*People v. Rivera* (1978), 64 Ill. App. 3d 49, 380 N.E.2d 1018.) While a motion for a continuance may be made when a material witness is unavail-

able, whether a continuance is granted or denied depends upon the particular facts and circumstances surrounding the request. (*People v. Petrovic* (1981), 102 Ill. App. 3d 282, 430 N.E.2d 6.) A motion seeking additional time to secure witnesses is properly denied where there is no reasonable expectation that they will be available in the foreseeable future. *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838; *People v. Park* (1980), 81 Ill. App. 3d 108, 400 N.E.2d 966.

In the instant case, we find that the trial court did not abuse its discretion in failing to grant defendant a third continuance in an attempt to secure the presence of an alleged alibi witness. Defendant was arrested on September 7, 1984, and was tried on February 20, 1985. It was not until the day of trial, after the State had rested its case in chief, that defendant requested a continuance to locate and bring to court his sole alibi witness. The trial court granted this request and also granted defendant's second request for a continuance the following day, allowing him then a four-day extension and instructing him that no further continuances would be granted. When trial then resumed and the witness failed to appear as he had promised defense counsel, the trial court denied defendant's third request for a continuance.

We believe that defendant's conduct in demanding trial, failing to locate and subpoena his sole alibi witness, failing to notify the court prior to trial of the matter and then seeking that additional time to locate the witness only after the first day of trial at the close of the State's case, clearly demonstrated a lack of diligence. From the date on which he demanded trial, defendant had almost six weeks to locate this alibi witness, yet apparently did not even speak with him until after the second continuance had been granted. Once defendant discovered that the witness was difficult to locate, he should have acted diligently in notifying the court of any problems in presenting this witness and in securing a postponement of his trial until the witness could be secured. Upon consideration of this matter, we find that the trial court properly concluded that there was no reason to expect that granting another continuance would enable defendant to do what he had been unable to do up until that time, *i.e.*, secure the presence of an alibi witness. Accordingly, we reject defendant's argument.

## II

Defendant's second contention on appeal is that the mittimus and notice of appeal should be amended to conform with his sentence. Specifically, defendant argues that while the record of the sentencing hearing indicates that the trial court sentenced him to a term of 10

years' imprisonment for armed robbery, the mittimus and notice of appeal indicated that defendant was sentenced to 15 years' imprisonment for that crime. We find that defendant's argument is without merit as we note that a supplemental record has been filed which contains a corrected transcript of the sentencing hearing which shows that defendant was in fact given a 15-year sentence for his crime. This supplementary transcript is the true and accurate transcription of that proceeding, and, as it now brings the mittimus into conformity with the trial court's intended sentence, it resolves and disposes of defendant's second argument.

For the reasons set forth above, we affirm the judgment of the circuit court. As part of our judgment, we grant the State's request and assess $50 against defendant as costs for his appeal.

Judgment affirmed.

LORENZ, J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. This case is but one of many cases that frequently come before this court in which the trial court has arbitrarily upheld the State's request, objection or position to the degradation and violation of the fundamental rights of an accused.

I deem it appropriate to point out that the facts of this case present the greatest challenge to the credibility of the criminal-investigation process, the accuracy of the identity of an accused as the offender, the integrity of the trial fact-finding process and the propriety of a guilty finding.

No written report or record was made of the facts and circumstances of the commission of the offense before the defendant was arrested. Thus, the State's witnesses were not restricted in their trial testimony to any recorded information given by them when they initially reported the offense to the police and as a result they were allowed testimonial flexibility and were permitted to conform their trial testimony to those facts which came to the witnesses' knowledge after the defendant's arrest. There could be little meaningful cross-examination or impeachment of the State's witnesses on their reported facts and circumstances of the robbery. Moreover, no written record, report or memorandum was made of the victim's descriptions of the offenders before the defendant was arrested. The same flexibility about the offender's description was allowed in the witness' trial testimony. Meaningful trial cross-examination or impeachment of the

State's witnesses about their prearrest descriptions was literally impossible. Thus, when this crime victim, immediately after the crime but before any written reports were prepared, identified as the offender an unfortunate individual who just happened to be on a public street, that individual, even if innocent, was confronted with the monumental if not impossible task of successfully defending against the accusation. He was denied persuasive and beneficial defense tools. He was confined to a simple denial that "I did not do it!" His denial may very well have been honest and truthful and the victim may have been honestly mistaken in the identification. For whatever reason the accused was where he was, he was identified as the offender shortly after the offense was committed and this tremendously militates against him. In this case, particularly because of the unique difficulty in defending against the State's case, the defendant should have been permitted to present his alibi defense.

There was no valid reason for the trial court to deny the defendant's request for a continuance to bring in his alibi witness. The denial was not only an abuse of the trial court's discretion, it also denied the defendant due process, his right to present a defense and his right to compel the attendance of witnesses in his behalf. The affirmance of his conviction affords the defendant 15 years' imprisonment within which to pursue these constitutional issues. A continuance in the trial court to enable the defendant to bring in his witness would have avoided these unnecessary collateral issues.

I also deem it appropriate to point out that the circumstances under which this defendant was identified as the offender were preposterously bizarre, incredibly unusual, and extremely suggestive. When the veneer is removed from the State's evidence, the basic facts of the State's case were that Lucille Elliott was mugged, robbed and maced by two black men on a CTA train. Rosalind Banfield was in another car on the train and saw two black men enter Elliott's car. Banfield did not witness the robbery of Elliott and did not know that the robbery had been committed until some time later. Banfield accompanied Elliott in the back of an ambulance to the hospital.

En route to the hospital and as the ambulance paramedic, Joseph Hogan, treated Elliott's injuries, Banfield described to Hogan the two black men she saw enter Elliott's car. Elliott described the two black men who mugged her. The evidence does not reveal the descriptions which Elliott and Banfield gave Hogan. It appears that the descriptions were, at most, clothing descriptions. Hogan looked out the ambulance window and saw a group of men standing on the street talking. One of the men miraculously fit the description which Elliott and

Banfield had given Hogan. Hogan told Elliott "to look out the window and see if she could see the guys" who robbed her.[1] Elliott and Banfield looked out the ambulance window and amazingly, there stood a man whom Elliott and Banfield identified as one of the robbers.[2] The person they identified was the defendant.

Hogan's direction to Elliott and Banfield to look out the window was based solely on their description of the offender's clothing and the clothing description of the person Hogan saw on the street when he looked out the ambulance window. Hogan testified that he did not "know exactly what [the person] looked like. *I just remember the clothing when I asked them to look* [but] *I didn't pay that much attention to him, like really recall his face."* Hogan did not rely on height, weight, build, age, complexion or any other identifying characteristics, except clothing, when he told Elliott and Banfield to look out of the window. This is extremely suspect.

The record establishes that the defendant lived at 4522 West Jackson, only a few doors from where he was standing when he was arrested. There is not one shred of evidence of a description of the defendant's clothing when he was arrested. The defendant did not have in his possession any of the robbery loot—a brown leather purse, $2, two diamond rings and a pair of men's boots—or the robbery weapons—a gun and Mace.

The defendant denied that he committed the robbery and asserted that during the entire afternoon he was in the immediate area where he was arrested with Marvin James Bryant, who was also with him when he was arrested.

The trial testimony of Elliott, Rosalind Banfield and the paramedic Joseph Hogan established that when the robbery occurred Elliott was en route from Hines Hospital on an eastbound CTA train on the west side of the city.

Two men entered the car in which Elliott was riding alone. One of the men sat directly behind her and the other sat on the opposite side of her. Elliott testified:

"Q. Could you describe these two men, please?

A. Yes. The one was walking in front. The other one *was short, very dark, had on a black shirt and a light cap like.*

Q. Were these men white or black?

---

[1] As hereafter pointed out, the testimony of Hogan, Elliott and Banfield is contradictory on this point.

[2] The testimony of Hogan, Elliott and Banfield is likewise contradictory regarding their identifications of the defendant at this time.

A. *They were black.*

Q. The one that you indicated was short with the cap, approximately how tall was he?

A. It was about five—*about five, five to five, seven,* in that range.

Q. Approximately how much did he weigh or what was his build?

A. *He was a medium build,* I'd say *weighed from about one twenty-five to about one thirty.*

\* \* \*

Q. Now, *the other person,* approximately how tall was he?

A. I'd say he was *a good six feet, maybe a little more* than six feet.

\* \* \*

Q. Did you notice any difference in the skin color between the two?

A. *He was a lighter complexion than the short man."* (Emphasis added.)

The above testimony established that Elliott described one of the offenders as a black man who was very dark, short—about 5 feet 5 inches to 5 feet 7 inches—of medium build, who weighed about 125 to 135 pounds and who wore a "black shirt" and a "light cap like." She described the other offender as a black man of lighter complexion than the short man and who was "a good six feet" or "maybe a little more than six feet" tall.

Elliott testified that the short man hit her on her head with a gun. She later recanted that statement and said that she was struck with a hard blunt object. She testified that the tall man held a gun in her face and told her not to scream because he would kill her. The tall man told her to give him her two diamond rings, $2, her brown leather purse and her husband's boots. He told her to get on the floor, which she did. The short man sprayed Mace in her face. She estimated that the men left the train about two or three minutes later.

Rosalind Banfield testified that she got on the fourth car of the train at the Des Plaines station and that Lucille Elliott got on the fifth car. She testified that she observed two men passing through the car in which she was riding and enter the next car, which was the car Elliott was in. Banfield testified:

"Q. What drew your attention to these two people?

A. That they were smoking on the train and just, you know, had a very poor disposition. They were smoking cigarettes and singing and sort of disrupting other passengers.

\* \* \*

Q. \*\*\* [W]hat color were these men?

A. Both of them were young black guys.

Q. Was there any difference in their colors?

A. One was darker.

Q. Which one was darker?

A. *The shorter fellow was dark.*

Q. The shorter person, approximately how tall was he?

A. *Five seven, five eight.*

Q. What was his approximate weight?

A. *I'd say 130.*

Q. *The other person that was taller*, approximately how tall was he?

A. *Six one, six one'ish.*

Q. You say it was the shorter person that spit?

A. Yes.

\* \* \*

Q. Did you see if he had any facial hair, talking about *the short one*?

A. *I would say a small mustache, hair around the upper lip.*

Q. Did you notice his hair?

A. *He had a hat on,* but I would say it was a natural, a short natural.

Q. Did you see any of his hair sticking out from the hat?

A. Yes.

Q. *What color was the hair?*

A. *Dark. Black.*

Q. Was there anything about his clothing that you can remember?

A. *That they had on a dark shirt.*

\* \* \*

Q. \*\*\* [H]ow old would you say *the shorter person was*?

A. *Early 20's.*" (Emphasis added.)

According to Banfield, one of the men she saw on the train was a black, dark complected 5 feet 7 inches to 5 feet 8 inches tall, weighed 130 pounds, had a small mustache, black hair, was in his early 20's, had a short natural and was wearing a hat and a dark shirt. She described the other man as a black man who was "six one, six one'ish" and who was also wearing a dark shirt.

Banfield testified that she did not see anything happen to Elliott, who was riding in the car behind her. Thus, Banfield did not observe

the men who passed through her car because she had witnessed a robbery. She simply saw two black males pass through her car smoking and one of the men spat. It is a logical assumption that her observations of the men would not have been as meticulous or detailed as they would have been if she had witnessed the robbery.

When the two men got off the train at the Cicero stop, Elliott was on the floor of the car between the seat and the wall. A man entered the car and asked her if she was hurt. She told him that she was. The man told her, "Stay right there, I'm going to get help, I'm going to get the conductor." He returned with the conductor.

Banfield testified:

"Q. Now, when he went back into the car number five with the conductor did you see what happened next?

A. I turned around and I saw them sort of looking toward the floor.

Q. Did you eventually see what or who was on the floor?

A. Yes, because I got up and I went to the next car.

Q. What did you see on the floor?

A. *I saw Lucille sprawled out with blood all around and hysterical and what not, on the floor."* (Emphasis added.)

Paramedics met the train at the Pulaski station. Banfield, Elliott and the paramedics walked up a long ramp to the ambulance. En route to the hospital, Elliott told the paramedic, Joseph Hogan, what had happened and gave him a description of the men who attacked her. The evidence does not reveal the description she gave Hogan. There are contradictions between the testimony of Elliott, Banfield and the paramedic about the circumstances in which the defendant was thereafter identified as one of the robbers. Elliott testified on direct-examination:

"Q. Now, did anything unusual happen after you gave that description [to the paramedic while in the ambulance en route to the hospital]?

A. He was driving, coming round the circle or the street and three men [were] standing on the corner and immediately when I saw this man, I recognized him.

Q. How many of the three men did you recognize?

A. I recognized the short man that hit me on the head.

\* \* \*

Q. What did you do when you saw that person you recognized being the short man?

A. I just said, 'There he is.'

Q. Do you see the person in court today that you pointed

out to the paramedics?

A. Yes I do.

\* \* \*

Q. What color were they?

A. *This man, the short man was very dark,* and the other men were brownskin a lighter complexion.

Q. Were all three men black·men though?

A. Yes." (Emphasis added.)

However, Elliott testified on cross-examination:

"Q. And while you were on the way to the hospital the paramedic was treating you, wasn't he?

A. Yes. He took my blood pressure.

Q. And the paramedic then said *'Could that be the men out there?' And pointed to the three men on the corner.*

A. *Yes.*

Q. That's when the ambulance came around and drove up in front of these three men.

A. Yes.

Q. *And that's when you first saw the three men.*

A. *He told me to look out the window.*

Q. So it was the paramedic that drew your attention to these three men.

A. I saw them anyway if he hadn't said anything.

\* \* \*

Q. When you pulled up in front of these three men you told the paramedic it possibly looked like the man didn't you?

A. No, I said 'That's the man.' I recognized him. *I recognized his clothes."* (Emphasis added.)

Elliott's testimony established that the paramedic told her to look out the ambulance window and that the paramedic pointed to the three men on the street. The evidence failed to establish what descriptions Elliott or Banfield gave the paramedic. More importantly, in her trial testimony the only description Elliott gave of the defendant when she saw him through the ambulance window standing on the street was that he was "very dark." Although she testified she recognized him by his clothes, in her trial testimony she did not identify or describe any clothing the defendant was wearing when she saw him on the street from the ambulance window. More significantly, the meager clothing description she gave of the robber on the train in her trial testimony was that the short one "had on a black shirt and a light cap like." The record does not reveal a description of what the defendant was wearing when he was arrested.

Banfield testified on direct-examination:

"Q. Did you give any description of either one of these men to the paramedics?

A. Yes I did.

Q. Did anything unusual happen while you were in the ambulance?

A. Well, the driver was proceeding to go to the nearest hospital ***.

* * *

And as he was driving, he was coming to a corner where some people were standing with similar descriptions to what Lucille and I had verbally shared with him and *to look out of the side window and see if these are the individuals that were on the train.*

Q. Were any of these three men one of the two individuals that you described that got on Car number five?

A. Yes.

Q. How many of the three?

A. *One looked familiar.*

Q. What did you do or say when you saw them only that looked familiar?

A. I verbally told the paramedic *yes, that guy looks familiar.*" (Emphasis added.)

In Banfield's trial testimony she merely described the clothing of the "shorter fellow" that she saw enter the car in which Elliott was riding as having a hat on and wearing a dark shirt. But Banfield's testimony did not establish what descriptions she gave the paramedic. Nor did Banfield's testimony establish any clothing or physical description of the defendant as he stood on the street.

It is unnecessary to assess the similarity between "a light cap like" and a black shirt, which was the clothing description of the shorter man Elliott gave in her trial testimony, and a hat and a dark shirt, which was the clothing description of the shorter person that Banfield testified she saw enter the car in which Elliott was riding. Neither of these scanty descriptions was of unusual wearing apparel.

Banfield's testimony established that the paramedic told her and Elliott "to look out of the side window and see if these are the individuals that were on the train." Banfield's identification was simply, "that guy looks familiar." This spurious identification contradicted the paramedic's testimony.

Joseph Hogan, the paramedic, testified on direct examination:

"Q. En route to Loretta Hospital did you and your partner

talk to Lucille Elliott and Rosalind Banfield?

A. Yes, while getting the blood pressure and checking her head in the back in the ambulance.

* * *

Q. Did she give you the description of the people that had struck her in the head?

Q. Yes."

Hogan did not say what descriptions he received from Elliott or Banfield. He testified further on direct examination:

"Q. What happened when you were going west on Jackson?

A. When we came up to Kostner and she had described the people and there was a guy on the corner and he was like slapping hands with the other guys. *** So the one guy looked exactly like what she had told us so we went up to, I think it's Kolmar, where *we made a U-turn to come back and then pulled over on the corner and asked her to look out the window and see if she could see the guys* ***.

Q. When you stopped, how far were you from these men?

A. Probably eight to ten feet.

Q. What color were these men?

A. Three or four black men.

Q. What happened when you stopped at that location?

A. We just pulled up to the corner real slow and then stopped for a minute and *the two ladies just said, one was definitely the guy* ***.

Q. Can you recall at this time which of the two ladies identified the person first?

A. *They both just started saying 'That's him.'* " (Emphasis added.)

Hogan's testimony that "the two ladies just said, 'one was definitely the guy,' " and that "they both just started saying, 'That's him' " contradicts Banfield's testimony that "one looked familiar," and "I told the paramedic, 'Yes, that guy looks familiar.' "

The following testimony of Hogan clearly established that he directed Elliott and Banfield to look out the window to see if the men were possibly the offenders, not because of their physical appearance but simply because of their wearing apparel. Hogan testified:

"Q. If you will look around and tell me if you see the person that they both pointed out to you on the corner.

A. *I am not really positive of who, you know, exactly what he looked like. I just remembered the clothing when I asked them to look.*

* * *

Q. Did you see that person taken into custody?

A. *Yes, but I didn't pay that much attention to him to really recall his face.*

Q. Were other people taken into custody with him?

A. Yes." (Emphasis added.)

Hogan told Elliott and Banfield to look out the window at the men standing on the corner because of what the men were wearing and not because of their facial or physical characteristics. Much could be said on this aspect of the identification. Much more could be said on the bizarre circumstances of the identification of the defendant as one of the offenders. While en route to the hospital, Hogan just happened to go by the very corner, only a few doors from the defendant's home, where one of the offenders just happened to be standing with two or three other black men. Much can also be said about the arrest of all of the men when only one was identified as an offender, and that none of the loot taken in the robbery nor either of the robbery weapons was found on the defendant. These matters go to the authenticity, credibility and accuracy of the defendant's identification as one of the offenders. Of course, these were matters within the province of the trial court. Based on the testimony I have set forth above, however, I believe the defendant should have been afforded the right to present his alibi witness.

Defendant's attorney informed the trial court in his opening statement, "Mr. Davis [the defendant], Judge, was on the street corner at this time [of the robbery] with a friend of his by the name of Marvin Bryant, also known as James Bryant, who will testify that he had been with Larry [the defendant] since about 2:30 in the afternoon. They were on a street corner. We believe the evidence will show that the ambulance went by and one of the men on the street corner said to the ambulance, something to the effect 'If you don't hurry up the person is going to die.' "

The State rested after this very short, three-witness trial, the transcript of which is only 58 pages. The defense attorney requested a continuance because "A witness I attempted to subpoena doesn't answer the phone." The trial judge continued the trial to the following day. On that day, the defense attorney informed the court that he had not been in contact with the witness and the court continued the trial to Monday, February 25, 1985. On that day, the following occurred:

"MR. FLAHERTY [Defendant's attorney]: I contacted the witness, talked to him Thursday afternoon, he informed me he would be in court today, Judge. It's now 11:15 he's not here

and I just called and he's not there either. \*\*\* At this time we would be asking for another continuance to bring in that witness.

THE COURT: This matter was commenced to trial on the 20th of February, it was continued at the defendant's request from the 20th to the 21st and then from the 21st until today. After the trial had commenced there was reference to producing a witness and that had not been successful. It is now 11:15. There is no reason to expect that granting you another continuance would allow you to do that which you have not been able to do up to this time.

MR. FLAHERTY: If I could say this, Judge, the witness does not have a phone and the address I contacted him at, I believe, is an unoccupied building and I attempted to subpoena him, Judge, and the subpoena was returned because it was an unoccupied building. I was attempting to contact him through the mother of a friend of Mr. Bryant. I contacted her a number of times, Judge, while she had never spoken to him, Judge. He did come to my office. *I interviewed him in my office and talked to him two or three times over the phone but not within the last month or six weeks.*

THE COURT: Last Thursday?

MR. FLAHERTY: Yes, your Honor, Thursday the 21st.

\* \* \*

*I don't think he is trying to hide because he doesn't have a phone, Judge. He might have a legitimate excuse as to why he is not here.*

THE COURT: The motion for continuance is denied." (Emphasis added.)

Such expediency was unwarranted. The defense attorney then made an offer of proof as follows:

"MR. FLAHERTY: I believe if James Bryant were there at the address of 4408 West Van Buren, and were here to testify, he would testify that on September 7, 1984, at approximately 2:30 in the afternoon, Judge, he left his house and met up with the Defendant, Larry Davis, at which time they did nothing but hang around the street corners. At about 4:40 in the afternoon, Judge his welfare check came, and he went to a currency exchange, Judge, cashed it, took the cash and at all times was with Mr. Davis and then went back to his address of 4408 West Van Buren, went inside the address, Judge, and about 4:40 or 4:45, put the money inside the house, Judge, he was not with

Mr. Davis, Judge, for a period of ten minutes, he came out of his apartment, Judge, at about 5:00 o'clock in the afternoon, at which time Mr. Davis and Larry Jones went up to the street corner and the street corner was the one Mr. Davis was arrested on, I believe he would testify, Judge, that as the ambulance was going by, Mr. Jones made a comment, 'If you don't hurry up, you are going to—'

THE COURT: Wait [sic], he is back on the street, now?

MR. FLAHERTY: He then came out about 5:00 o'clock, Judge, and at 5:00 o'clock, they went on the corner of Kilborn [Kilbourn] and Jackson and waited.

From 2:30 in the afternoon up until the time he was arrested, except for a short ten minute period, Judge, he was at all times with Mr. Davis here. And as the ambulance was going by, the ambulance that had the complainant, Judge, Mr. Jones, who was the third person there, also made a comment, the comment being, 'If you don't hurry up, the person is going to die,' at which time he yelled it out to the ambulance and the ambulance made a U-turn and came back, at which time, the witness, Rosalind Banfield, who was the witness in this case, exited a police car and the complainant, Lucille Elliott, exited the ambulance, at which time, Miss Elliott pointed and said, 'The man with the white hat, I think he did it.' The man who was wearing the white hat at that time, Judge, was Larry Jones, the third person that was there.

At the police station, Judge, Mr. Bryant would testify that Larry Davis, who had a Washington Redskins scarlet colored hat, was picked out of the lineup. And, at all times, as I said, Judge, from 2:30 until 5:00 o'clock, except for a ten minute period, he was with Mr. Davis."

It was thereafter stipulated that Detective Harlan Rothged was the detective assigned to the defendant's lineup which Banfield and Elliott viewed and that if called to testify, Rothged would testify in accordance with his report, which read: "The witness Banfield positively identified the subject, Larry Davis, as one of the persons she saw entering the train car, containing the victim, and the victim tentatively identified the subject, Larry Davis, as the one who struck her in the head from behind." This stipulated testimony contradicted Elliott and Banfield's trial testimony of their identifications of the defendant as the offender.

The court found the defendant guilty of robbery and aggravated battery and imposed 15- and 5-year sentences, respectively, for those

offenses.

Based on the facts and circumstances presented, there was no justifiable reason for the trial court to deny the defendant's request for a continuance to bring in his alibi witness. There was no valid reason for the trial court to rush to judgment. Many trials last a far greater period than three days—Thursday, Friday and Monday—as this case did. Many cases, both civil and criminal, are tried in fragments, over a period of days, weeks and even months because of the inability or difficulty in bringing in witnesses, particularly in cases in which a jury has been waived and the case is being tried by the court. This has been and is a common and accepted practice and should be encouraged to promote justice. It should not be abandoned. The defendant was in custody and was the only one who would have been inconvenienced by the delay which he requested. The trial court should have given him his full day in court—a full trial.

For the previously stated reasons, the defendant was put to the difficult task of defending against the accusation made against him. His alibi witness might very well have tilted the scale in his favor. The State's evidence established that he was in the company of two or three individuals when he was arrested with them. The State could easily have determined if one of those persons was the defendant's alibi witness, James Bryant. The defendant had a constitutional right to due process, the right to defend against the offense, to compel the attendance of witnesses in his behalf and the right to call his alibi witness. The record reflects that the defendant was in custody continuously from the time of his arrest to the trial and thus was unable to personally aid and assist his lawyer in marshalling his witness. The cases are legion which hold that to deny a continuance under the circumstances here is an abuse of the trial court's discretion. *People v. Cobb* (1983), 97 Ill. 2d 465, 455 N.E.2d 31; *People v. Reyes* (1981), 102 Ill. App. 3d 820, 429 N.E.2d 1277; *People v. Timms* (1978), 59 Ill. App. 3d 129, 375 N.E.2d 1321; *People v. Robinson* (1973), 13 Ill. App. 3d 506, 301 N.E.2d 55.

In *Timms*, this court stated:

"The law concerning this matter was well stated in *People v. Robinson* (1973), 13 Ill. App. 3d 506, 610, 301 N.E.2d 55, 57:

'The granting or denial of a continuance to obtain evidence or procure a witness is within the discretionary powers of the trial court. [Citation.] When reviewing the exercise of the court's discretion, this court must determine whether defendant had acted diligently in his attempts to obtain the evidence [citation], whether the evidence would be material

to the case and might affect its outcome [citation], and whether defendant has been prejudiced in his right to a fair trial. [Citation.]' " (*People v. Timms* (1978), 59 Ill. App. 3d 129, 135, 375 N.E.2d 1321.)

The defendant satisfied each of these criteria. His request for a continuance should have been granted. The trial court, in my judgment, committed an egregious error when it denied the defendant's request. The United States Supreme Court stated in *Washington v. Texas* (1967), 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 1023, 87 S. Ct. 1920, 1923, "Just as an accused has a right to confront the prosecution's witnesses for the purpose of challenging their testimony, *he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.*" (Emphasis added.)

*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273; *People v. Petrovic* (1981), 102 Ill. App. 3d 282, 430 N.E.2d 6; *People v. Park* (1980), 81 Ill. App. 3d 108, 400 N.E.2d 966, *cert. denied* (1981), 449 U.S. 1085, 66 L. Ed. 2d 810, 101 S. Ct. 873; and *People v. Rivera* (1978), 64 Ill. App. 3d 49, 380 N.E.2d 1018, on which the majority relies, are not analogous to the case before us.

In *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, at his arraignment, the defendant pleaded not guilty and personally demanded trial. When the case was called for trial on the set trial date, over his attorney's objections and request for a continuance, the defendant again personally answered ready for trial and again demanded trial. The trial court had postponed another trial to accommodate the defendant's demand, had admonished the defendant, and said that if the State was prepared to go to trial, no continuance would be granted. The trial court denied the motion of the defendant's attorney for a continuance because (1) the witness who the defendant said he had sought was never identified; (2) the materiality of the absent witness' testimony was not revealed; (3) a reasonable likelihood that the witness could be found was not asserted; (4) there was no showing of what efforts had been made to locate the witness; and (5) the defendant had informed the court he was ready for and demanded trial. The supreme court held that the trial court did not abuse its discretion in denying the defendant's request for a continuance.

In *People v. Petrovic* (1981), 102 Ill. App. 3d 282, 288, 430 N.E.2d 6, a bench trial, in response to defense counsel's request for a continuance the trial court stated, "[I]f it requires putting on any defense witnesses, and you intend to do that, and if you have to bring in any-

one we'll give you another day." It does not appear that the defense attorney again requested a continuance after the State had rested and after the defendant had presented several alibi witnesses and had testified himself. This court held that based on these facts and because no offer of proof was made which prevented the State from stipulating to the witness' testimony, and because no statement or showing was made that the denial of a continuance interfered with the preparation of the defense or otherwise prejudiced defendant's rights, the trial court did not abuse its discretion in denying the defendant's request for a continuance.

In *People v. Park* (1980), 81 Ill. App. 3d 108, 400 N.E.2d 966, *cert. denied* (1981), 449 U.S. 1085, 66 L. Ed. 2d 810, 101 S. Ct. 873, after the defendant had demanded trial, he requested a continuance on the grounds that he belatedly became aware of the precise time of the commission of the offense. This court held that the trial court properly denied the request because the police reports previously given the defendant pursuant to discovery contained a detailed account of the offense, including the time of its occurrence.

In *People v. Rivera* (1978), 64 Ill. App. 3d 49, 380 N.E.2d 1018, because the defendant did not raise the denial of his request for a continuance in his post-trial motion but raised the issue for the first time on appeal, this court held the issue was waived. The court further pointed out that there was a lack of diligence in procuring the attendance of the witness, that the defendant failed to establish that the testimony of the absent witness was vital to the defense, that the absent witness' testimony would corroborate only collateral aspects of defendant's testimony, that the defendant did not give the State an opportunity to stipulate to the testimony of the absent witness and that the outcome of the case would not have been different had the testimony of the absent witness been received. The court held that the trial court did not abuse its discretion in denying the defendant's request for a continuance.

None of the foregoing authorities relied on by the majority are remotely comparable to the case at bar and are therefore not controlling.

For the reasons stated, I am of the opinion that the trial court abused its discretion in denying the defendant's request for a continuance. I would reverse the defendant's conviction and the judgment entered thereon and remand the cause for a new trial.