THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS C. KOKORALEIS, Defendant-Appellant.

Second District   No. 84—0890

Opinion filed November 13, 1986.—Rehearing denied December 30, 1986.

STROUSE, J., dissenting.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (Kenneth R. Boyle, of State's Attorneys Appellate Prosecutor's Office, of Springfield, and William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of Elgin, of counsel), for the People.

JUSTICE LINDBERG delivered the opinion of the court:
Defendant, Thomas Kokoraleis, was charged by indictment with the murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)) and rape (Ill. Rev. Stat. 1981, ch. 38, par. 11—1(a)) of Lorraine Borowski. At the conclusion of a nine-day jury trial, guilty verdicts were returned on both charges. Defendant appeals, raising five issues for review: (1) whether his statements to police officers were voluntary; (2) whether the trial court erred in excluding statements by two other men which failed to mention defendant's participation in the offense; (3) whether the State proved the *corpus delicti* of the rape offense; (4) whether the natural-life prison sentence for murder should be reduced; and (5) whether the extended-term sentence for rape is lawful. For reasons developed later in this opinion, we reverse defendant's murder conviction and remand that cause for a new trial. We reverse defendant's conviction for rape because the State failed to present evidence independent of defendant's confession tending to establish the commission of rape.

The following recitation of facts provides a general background of the events precipitating this prosecution. We do not include an exhaustive statement of facts because many of the facts are discussed where necessary to resolve the legal issues raised by defendant. Specifically, the facts surrounding defendant's statements to the police officers are abbreviated here because they are recited more comprehensively in our treatment of the voluntariness issue later in the opinion.

On October 10, 1982, Steven Grist, a 15-year-old resident of Darien, discovered the remains of a human in some brush amidst trees

and tall grass in the Clarendon Hills Cemetery. Du Page County deputy coroner Peter Siekman arrived at the scene and found a greatly decomposed human body and clothing remains. He later prepared a death certificate for Lorraine Borowski.

Also present at the cemetery on October 10, 1982, was Douglas Miller of the Du Page County sheriff's department. He found the skeleton on its back with a pullover top on the body. Puncture holes were discovered on the lower portion of its back side. Both of the clasps on the bra found around the body were closed. Miller did not recall if the panty hose was discovered pulled up to the waist, but stated the pair of pants found on the body was separated at the center seam.

Defendant did not testify at his trial. The principal evidence linking defendant to the crime was a tape-recorded statement, played to the jury and submitted to the jury as two statements, which defendant made to certain police officers in November 1982. The statements concerned the homicides of Borowski and Linda Sutton, a black woman killed in May 1981. The statements were admitted at trial after the court denied defendant's pretrial motion to suppress the statements on the basis that they were the result of physical and mental coercion and hence were involuntary.

Several detectives of the Du Page County sheriff's office testified concerning the events preceding and the substance of defendant's confessions. On November 10, 1982, nearly one month after the victim's remains were discovered, Detectives John Sam and Warren Wilkosz of the Du Page County sheriff's office were canvassing the Villa Park neighborhood of defendant's father. Wilkosz knew that Robin Gecht (Gecht), Edward Spreitzer (Spreitzer), and Andrew Kokoraleis (Andy), defendant's brother, had been arrested and charged with the murder, rape, and mutilation of women in the Chicago area. Sam was investigating the Borowski homicide, and Wilkosz had been assigned to the suspected Sutton homicide. At approximately 2 p.m., defendant approached the detectives on the street, introduced himself as Andy's brother, and expressed a desire to talk about Andy.

Defendant agreed to travel with the detectives to the Villa Park police station. Subsequently, defendant agreed to take a polygraph examination, which occurred at approximately 5:15 p.m. at the Elmhurst police station that same day. At approximately 6:45 p.m., Sam and Wilkosz began questioning defendant, and at 8:42 p.m., defendant gave a taped statement to the officers regarding the Borowski homicide which was played to the jury.

Defendant stated that he, Spreitzer, and Andy grabbed a woman at a shopping mall and forced her into a light-gray, two-door 1977 car.

They stopped at a motel located 10 minutes away and checked into a room. Spreitzer brought the woman into the room and undressed her. Each person except for defendant had intercourse with the woman, whose hands were tied to the bed and whose mouth was gagged. Andy then took out a 3- or 4-foot length of wire, tied it on her left breast, and squeezed until the breast came off. Spreitzer then struck an ax against her chest and killed her. After dressing the victim, the three men put her in the car, drove to a cemetery at approximately 11 a.m., and dropped the body in some short grass.

Sometime after the questioning concluded at the Elmhurst police department, Sam and Wilkosz drove defendant back to the Du Page County sheriff's office. Passing the intersection of Route 83 and St. Charles Road, Sam asked defendant if the area looked familiar and defendant answered that it did. Defendant thought it looked like the location where the white girl was picked up. Sam said defendant then directed them to the REMAX office, which he identified as the spot where the abduction occurred.

In addition to defendant's confession and his identification of the scene of the abduction, the State introduced the testimony of several witnesses who supplied facts about the events on May 15, 1982. Kathleen Zingraf, who lived in an apartment building on the same floor as that of the victim, said she saw the victim leaving her own apartment at approximately 8 a.m. on May 15, 1982. Robert Cercone, who was then the manager of a store located in a shopping center at Route 83 and St. Charles Road in Elmhurst, observed a commotion involving a woman next to an open car door at approximately 8:30 a.m. on May 15, 1982. Also testifying was Thomas Luehring, who drove his car into the shopping-center parking lot that day between 8:05 and 8:15 a.m. He observed a gray, four- or five-year old American car leaving the parking lot driven by a white man with curly light-brown hair who was between 18 to 30 years old.

The owner of the victim's place of employment, Donald Stibbe, testified the victim was scheduled to work that day. Upon arriving at the office in the shopping center after 8:30 a.m., he noticed some keys, money, and other items on the sidewalk near the office and thereafter called the police. The items were later identified as belonging to the victim.

The State also offered the testimony of Frank Orlosky, a physical anthropologist, who examined the remains of the victim on October 11, 1982. He was asked to determine signs of trauma that might be related to a cause of death. Skin covered the abdominal region and lower chest, pelvic bones, left thigh, ankle and foot, the right thigh,

leg and foot, and the left arm and part of the right arm. He attributed the missing skin to chemical and insect decomposition. While he located the right nipple, the skin ended 2 inches below where the left nipple should have been located. He found no trauma in the left breast area, although he acknowledged a clean cut in the area of the left breast would leave no signs of mutilation or trauma. In the lower thoracic area, skin extended from 8 inches above the navel to 4½ inches below the navel.

The first vertebra of the body was missing, as were some bones in the fingers and toes. Orlosky detected primary trauma on the sternum. He observed a circular frontal entrance wound in the upper part of the bone and an exit wound on the other side; sharp bones spines protruded inward. Circular entrance and exit wounds, 2 millimeters in diameter, were observed on the second left and right ribs. Injury to the sixth and seventh thoracic vertebrae was evident. Also observable were superficial scrapes and trauma on the spinus process of the ninth vertebra. The head of the 11th right rib was absent, and the rib was displaced. The nasal bone was fractured. Orlosky stated his examination revealed that certain of the entrance wounds were in the victim's back. In Orlosky's opinion, the circular wounds were caused by a small, circular object like an ice pick.

Following presentation of the State's case, the defense offered the testimony of several witnesses who worked at the motel where defendant stated the events took place. During May of 1982, Ann Bruenning was employed as a maid and laundry person from 9 a.m. to 3 p.m. seven days a week. She recalled nothing unusual regarding the condition of the rooms that month; no thefts of mattresses or bed sheets, no overturned furniture, no handcuffs, and no large amounts of blood on the floor or furniture. Similar testimony was offered by Harry Lux, one of the owners of the motel who also lived on the premises and stripped 80% of the linen. In May 1982 he noticed no mattresses or sheets missing, no handcuffs, and no large amounts of blood in any room.

Defendant also introduced the testimony of Dr. Albert Stipes, a psychiatrist, regarding his examinations of defendant. Stipes described defendant as functioning in the borderline range of intelligence, just above mental retardation. As he was eager to please people, he would provide an answer even if he did not know the answer to an inquiry. Defendant is intimidated by authority and is susceptible to being led easily. Stipes admitted on cross-examination that no question existed as to defendant's sanity and that defendant's fund of general knowledge is average. Defendant's intelligence level does not af-

fect his morality or his truthfulness.

After the close of proofs, the case was submitted to the jury, which returned guilty verdicts on the charges of murder and rape. Finding that the offenses constituted exceptionally brutal and heinous conduct, the court on September 7, 1984, imposed a term of natural-life imprisonment without parole for the murder conviction and an extended term of 60 years' imprisonment for the rape conviction. Defendant filed a timely notice of appeal on September 14, 1984.

■■ Defendant first contends the trial court erred in denying his motion to suppress his confessions. The State responds that the trial court correctly concluded the statements were voluntary. A determination whether a statement has been given voluntarily requires a court to consider the "totality of the circumstances." (*People v. Martin* (1984), 102 Ill. 2d 412, 426-27, 466 N.E.2d 228, 234, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334; *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) The test for voluntariness is whether the statement was made freely and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. (*People v. Martin* (1984), 102 Ill. 2d 412, 427, 466 N.E.2d 228, 234; *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606; *People v. Holloway* (1985), 131 Ill. App. 3d 290, 307, 475 N.E.2d 915, 928.) Other relevant factors are the age, education and intelligence of the accused, the duration of the questioning, and whether the defendant was given his constitutional rights or was subjected to physical punishment. (*People v. Martin* (1984), 102 Ill. 2d 412, 427, 466 N.E.2d 228, 234; *People v. Holloway* (1985), 131 Ill. App. 3d 290, 307, 475 N.E.2d 915, 928.) A reviewing court may consider evidence introduced at the trial as well as at the suppression hearing in determining whether the trial court's decision denying the motion to suppress was correct. (*People v. Caballero* (1984), 102 Ill. 2d 23, 36, 464 N.E.2d 223, 229-30, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362.) In determining whether a defendant's confession is voluntary, the finding of the trial court will not be disturbed unless contrary to the manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731; *People v. Cortez* (1986), 143 Ill. App. 3d 1024, 1027, 494 N.E.2d 169, 171.

We first discuss the duration of defendant's interrogation because this factor defines the scope of our subsequent analysis. Defendant essentially complains about four statements which were admitted into

evidence at trial. Three of the statements were made on November 10, 1982. The first statement, recorded as an audio tape concerning the Borowski homicide, began at 8:40 p.m. and ended at approximately 9:40 p.m. A typed transcript of this first statement, introduced as the State's exhibit 1, was signed by defendant at 2:50 a.m. on November 11, 1982. The second statement, also taken as an audio tape concerning the Linda Sutton homicide, began at 10:30 p.m. In his third statement, defendant told Detectives Sam and Wilkosz that the incident involving Linda Sutton occurred in May 1981 at the same Villa Park motel where he claimed Borowski was murdered.

Based upon these facts, the State argues that the relevant time frame for assessment of the police conduct is from sometime after 2 p.m., when defendant approached Detectives Sam and Wilkosz, until the statements were obtained late in the evening on November 10. Defendant counters that the police conduct which occurred during the entire 50 hours of questioning must be considered as it demonstrates the police officers' intent to obtain a full confession regardless of defendant's constitutional rights. We agree with the State that the officers' conduct following the three statements made by defendant on November 10 is irrelevant to the voluntariness of those three statements.

Defendant also asserts that one statement which he made on November 12, 1982, was involuntary and thus was improperly admitted by the trial court. This statement was made by defendant to a detective on November 12, 1982, and was introduced through the testimony of Detective Sam. In analyzing the voluntariness of this statement, the actions of the police officers on November 11 and November 12 are relevant. We therefore first review the actions of the detectives which occurred prior to the three statements made by defendant before 12 p.m. on November 10. After determining the voluntariness of the first three statements, we proceed to analyze the impact of the November 11 and 12 police conduct on the voluntariness of defendant's fourth statement, made on November 12.

The testimony at the suppression hearing indicated that the questioning during the period from 2 p.m. to 12 p.m. on November 10 was not continuous. Defendant approached the detectives sometime after 2 p.m. on November 10, informing them he wished to talk about his brother Andy. (Cf. People v. Davis (1983), 95 Ill. 2d 1, 24-25, 447 N.E.2d 353, 364, cert. denied (1983), 464 U.S. 1001, 78 L. Ed. 2d 697, 104 S. Ct. 507 (where, in finding statement voluntary, the court noted that the defendant, like defendant here, initiated the contact with the police officer).) Defendant agreed to travel with the detectives to the

Villa Park police station, and they arrived at 2:30 to 2:45 p.m. Sam informed defendant that he was free to leave and to use the phone.

Defendant then began discussing how Gecht controlled other people, including Andy. Within a few minutes, Wilkosz asked defendant if he would undergo a polygraph examination, and defendant agreed. From 3:15 p.m. until 5:15 p.m., when the examination began, defendant was not questioned about the murders. The polygraph examination lasted 1½ to 2 hours. After the detectives discussed the test results with Commander John Millner of the Elmhurst police department, who conducted the polygraph examination, defendant was questioned until his first audio tape, concerning the Borowski homicide, which lasted from 8:40 to 9:40 p.m. Defendant gave a recorded statement concerning the Sutton homicide, which lasted from 10:30 to 10:50 p.m. Defendant gave a third statement from 10:50 to 11:10 p.m. concerning the murder of an oriental woman. Only the first two statements were introduced at defendant's trial. About 12 p.m. on November 11, Wilkosz and Sam drove defendant to the Du Page County sheriff's office, and during the trip they passed the scene of the Borowski abduction. Defendant identified the shopping center where the abduction occurred. Upon arrival at the Du Page office, defendant received a meal. After eating, defendant was questioned by Detective Larson regarding a fourth homicide. Defendant read and signed his typed statement regarding the Borowski homicide at 2:50 a.m.

■ As is evident from this recitation of events, defendant was not subject to 12 to 14 hours of continuous questioning prior to making his statements. After six hours of contact with the officers, defendant gave his first statement in which he implicated himself in the Borowski homicide. Even if the duration of questioning is extended to include the time period prior to his review and signing of this statement in typed form, the time period with the detectives was only 13 hours. The officer testified that defendant was told he could use the phone and that he never requested to use the phone. The duration of the questioning prior to his review of the Borowski statement is not so long as to render the trial court's denial of defendant's motion to suppress against the manifest weight of the evidence.

We must next consider the significance of police conduct following defendant's November 11 written statement at 2:50 a.m. on the voluntariness of defendant's statement made to detectives on November 12, 1982. In his November 12 statement, defendant identified one of two cemeteries which he had visited on November 11 as the cemetery where they left the victim's body.

Following his review of his statement regarding the Borowski

homicide, defendant was not questioned. Instead, the detectives made arrangements for defendant to sleep, placing a mattress and bedding in the interview room of the Du Page County sheriff's office. While defendant slept, Wilkosz said one of his hands was handcuffed to the wire-mesh storage locker. However, Detective Thomas Vosburgh of the Du Page County sheriff's office stated defendant was not handcuffed when he first observed defendant sleeping in the interview room between 6:30 to 7 a.m. on November 11.

According to Vosburgh, defendant awoke after 7 a.m., had breakfast, and showered. Defendant was provided with a candy bar, cigarettes, and coffee between 8:30 to 12 that morning. After receiving *Miranda* warnings, defendant was questioned between 10 a.m. to 12 a.m. on November 11 regarding the disappearance of a different female. From 12 to 3:15 p.m., Vosburgh drove defendant to certain areas and then returned him to the station. One-half hour later, Vosburgh and Detective Kurzawa of the Du Page County sheriff's office drove defendant to two cemeteries. One detective stated defendant was not questioned during this 1½-hour trip.

Later that day, defendant was provided with dinner and then was taken to a hotel in West Chicago. Another detective brought donuts to the hotel room. Defendant gave a statement from 7:30 to 8:25 p.m., which was recorded in the hotel room by a court reporter, Gloria Apostolos. Apostolos testified at the hearing that prior to the statement, defendant, in response to the detective's questions, said that he was comfortable, was not tired or hungry, and that he felt fine.

At the beginning of the tape, defendant received his *Miranda* rights, and he responded that he understood them. He stated he had not been coerced by the detectives to make any statements and had not been mistreated. Defendant was asked to characterize his treatment, and defendant stated he could freely use the bathroom and had all the coffee he desired. He was fed breakfast, lunch, and dinner, was allowed to sleep, and was treated fairly. The statement given by defendant in the hotel room concerned an abduction of a female unrelated to the case at bar. At the conclusion of the statement, defendant said he had spoken of his own free will without promises from anyone.

With Detective Gradie Clark of the Wheaton police department, defendant left the hotel at 10 p.m. searching for a particular open field in Hanover Park where defendant had indicated a body might be found. They returned at approximately 11 p.m. Defendant then showered and went to sleep around midnight. He slept until sometime after 6 a.m. on November 12.

At 7:30 a.m. on November 12, defendant left the hotel with Detectives Clark and Vosburgh to search various fields for the body which defendant had referenced in his statements to the detectives in the hotel on the evening of November 11. At 12:30 p.m., defendant was interviewed at the Du Page County sheriff's office by Detectives Kurzawa and Sam. Defendant was again advised of his *Miranda* rights; the rights and defendant's answers were transcribed by court reporter Apostolos. Again, defendant stated he had received no threats or promises and that he had been provided everything he asked for, including sleep and food. The interview concerned the abduction of Borowski and Sutton, but his transcribed statement was never introduced at defendant's trial. The interview concluded at 12:40 p.m. on November 12.

During this interview, defendant indicated he had lied on November 11 when he claimed not to have recognized the cemetery. Retracting his earlier statement, defendant told Sam and Kurzawa that he did recognize one of the cemeteries. Defendant asserts that this statement was erroneously admitted because the duration of the interrogation rendered his statement involuntary.

■ While the 46-hour time span between defendant's introduction to the detectives and this statement is far greater than that preceding defendant's two written statements made on November 10, we cannot conclude that the time span here necessarily rendered the statements involuntary. (Compare *People v. Davis* (1983), 95 Ill. 2d 1, 25, 447 N.E.2d 353, 364-65 (court not required to assume confessions after six hours of questioning were involuntary where the defendant indicated a willingness to discuss the crimes), *cert. denied* (1983), 464 U.S. 1001, 78 L. Ed. 2d 697, 104 S. Ct. 507.) The record here indicates defendant was fed regularly and was allowed to sleep each evening. Witnesses testified defendant never was forced to proceed against his wishes. In fact, the record suggests defendant was always amenable both to the questioning and to the investigation of the various physical sites. The record contains no evidence that defendant asked to see an attorney and was denied such an opportunity. Only once did defendant request that the questioning cease, when on the evening of November 11 he indicated he was tired. He was then permitted to shower and to sleep. Significantly, defendant was questioned throughout this period regarding a number of cases involving different jurisdictions. The trial court could have concluded that the lengthy questioning was in large part the result of the numerous homicides involved. As the duration of the questioning is only one factor in the totality of the circumstances which courts consider, the 46-hour period

in light of the unique facts in this case was not so long as to render involuntary defendant's one statement made during the 12:30 p.m. interview on November 12.

█ Defendant also makes a slightly different argument, related to the duration of his questioning, based upon a New York decision (*People v. Leonard* (1977), 59 A.D.2d 1, 397 N.Y.S.2d 386), that the delay in arraigning him rendered his statements involuntary. The failure to bring a defendant before a judge without unnecessary delay will not render a confession *per se* invalid. (*People v. Medley* (1983), 111 Ill. App. 3d 444, 447, 444 N.E.2d 269, 271, citing *People v. Zepeda* (1970), 47 Ill. 2d 23, 265 N.E.2d 647; Annot., 28 A.L.R.4th 1121 (1984) (admissibility of confession or other statement made by defendant as affected by delay in arraignment).) Unnecessary delay is only one of the factors which courts consider. (*People v. Medley* (1983), 111 Ill. App. 3d 444, 447, 444 N.E.2d 269, 271-72, citing *People v. Taylor* (1968), 40 Ill. 2d 569, 241 N.E.2d 409.) In *People v. Allen* (1983), 116 Ill. App. 3d 996, 452 N.E.2d 636, *aff'd in part, rev'd in part on other grounds* (1985), 109 Ill. 2d 177, 486 N.E.2d 873, the appellate court ruled that a two-day delay in bringing the defendant before the court for a preliminary hearing did not render her statements involuntary. Like here, the defendant in *Allen* made her first statement within a few hours after she was in custody. The *Allen* court held that the statements were voluntary because it found no indication that delay contributed to the making of the statements. (116 Ill. App. 3d 996, 1012, 452 N.E.2d 636, 648.) As the record here supports the conclusion that defendant gave his statements voluntarily, any delay in arraigning defendant did not render the statements involuntary. Accordingly, the duration of defendant's questioning does not establish that the trial court's finding of voluntariness is against the manifest weight of the evidence.

█ In analyzing the remaining factors comprising the totality of the circumstances, we consider together all of the statements which defendant asserts were involuntary. The age, education, and intelligence of the accused are additional factors bearing upon the voluntariness of the statements. (*People v. Cooney* (1985), 136 Ill. App. 3d 989, 484 N.E.2d 802, *cert. denied* (1986), 476 U.S. 1159, 90 L. Ed. 2d 720, 106 S. Ct. 2278.) Neither party suggests defendant's age, 24 at the September 1984 sentencing hearing, is a very significant factor in determining the voluntariness of his confession. Defendant does emphasize his educational background and intelligence level. Although defendant was a special education student and dropped out of occupational school three years after completing grade school, a low educa-

tion level does not require the conclusion that the defendant's confession is involuntary. See *People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915.

Nor does defendant's low intelligence level require a finding of involuntariness. Evidence of limited intellectual capacity, standing alone, does not indicate that a defendant is incapable of waiving his constitutional rights and making a confession. (*People v. Creamer* (1986), 143 Ill. App. 3d 64, 492 N.E.2d 923; *People v. Rogers* (1986), 141 Ill. App. 3d 374, 490 N.E.2d 133; Annot., 8 A.L.R.4th 16 (1981) (mental subnormality of accused as affecting voluntariness or admissibility of confession).) Such evidence is but one of the issues to be considered in reviewing the totality of the circumstances under which a confession is made. (*People v. Hester* (1968), 39 Ill. 2d 489, 500; 237 N.E.2d 466, 474, *cert. dismissed* (1970), 397 U.S. 660, 25 L. Ed. 2d 642, 90 S. Ct. 1408.) As a prerequisite to accepting a waiver, the police are not required to conduct a mental examination of the accused with a view to ascertaining his ability to comprehend his rights. *People v. Ellison* (1984), 126 Ill. App. 3d 985, 992, 466 N.E.2d 1024, 1028.

As tested in June 1983, defendant's full-scale Wechsler Adult Intelligence Score was 75. At the hearing on the motion to suppress, Dr. Albert Stipes, a psychiatrist, testified based upon his examination of defendant that he was not retarded, but described him as borderline retarded and said his test results were higher than those of 4% of the population. His low intelligence level rendered defendant susceptible to being misled easily. While defendant has poor verbal skills, defendant is able to understand ordinary conversation and *Miranda* warnings, but Stipes had serious doubts whether defendant could knowingly waive his *Miranda* rights because of his difficulty in appreciating the long-term consequences of his actions. Stipes described defendant as nonassertive and intimidated by authority. Stimulants, such as caffeine and sugar, and exhaustion would exacerbate defendant's poor judgment.

In a case analogous to the one at bar, the 16-year-old defendant with an intelligence score of 54 in the moderately retarded range sought reversal of his conviction on the basis that his confession was involuntary. (*People v. Racanelli* (1985), 132 Ill. App. 3d 124, 476 N.E.2d 1179.) An expert, a psychologist, testified the defendant could not understand the *Miranda* warnings unless they were explained in "simpler language." The psychologist testified the defendant probably did understand the words "court," "judge," "lawyer," "silent," "free," and "no charge." In contrast, the expert here opined that

defendant understood the *Miranda* warnings, but expressed doubts whether he could intelligently waive the warnings.

The *Racanelli* court considered the psychologist's opinion but observed in part that the defendant did understand various words, appeared to understand the warnings, explained to the officers that he understood the warnings, and was aware that he had the right to speak with an attorney. Stating that the trial judge was not bound by the expert's conclusions of fact, the *Racanelli* court concluded the trial court's denial of the defendant's motion to suppress was not against the manifest weight of the evidence. *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 133, 476 N.E.2d 1179, 1182-83.

■■ ■ While here defendant did not have prior experience with the criminal justice system as did the defendant in *Racanelli*, the defendant there possessed substantially lower intelligence and apparently had some difficulty understanding the *Miranda* warnings. Several officers here testified they noticed nothing unusual about defendant during his questioning and that he appeared to understand his *Miranda* warnings. A defendant's confession is not involuntary because he may not have understood the principles of criminal accountability and the implications of the acts admitted. (*People v. Martin* (1984), 102 Ill. 2d 412, 427, 466 N.E.2d 228, 235, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.) We therefore find *Racanelli* supportive of our conclusion that defendant's age, intelligence, and education did not render defendant's statement involuntary. See *People v. Clements* (1985), 135 Ill. App. 3d 1001, 482 N.E.2d 675, *cert. denied* (1986), 476 U.S. 1106, 90 L. Ed. 2d 361, 106 S. Ct. 1952 (confession of 16-year-old defendant with intelligence score of 54, who, according to a psychologist, was compliant and was unable to understand *Miranda* warnings, held voluntary); *People v. Williams* (1984), 128 Ill. App. 3d 384, 470 N.E.2d 1140 (confession of mentally handicapped defendant with initial trouble understanding *Miranda* warnings held voluntary); *People v. Ellison* (1984), 126 Ill. App. 3d 985, 466 N.E.2d 1024 (confession of a 28-year-old defendant with intelligence score of 77 and with an eighth-grade level of education held voluntary); *People v. Allen* (1983), 116 Ill. App. 3d 996, 452 N.E.2d 636, *aff'd in part, rev'd in part on other grounds* (1985), 109 Ill. 2d 177, 486 N.E.2d 873 (confession of a 19-year-old defendant with no prior arrests and eighth-grade education at a school for slow learners held voluntary); *People v. Gore* (1983), 116 Ill. App. 3d 780, 452 N.E.2d 583 (confession of defendant with an intelligence score of 84 held voluntary); *People v. Leiker* (1983), 115 Ill. App. 3d 752, 450 N.E.2d 37 (confession of defendant with intelligence score of 75 and

with poor grammar and vocabulary held voluntary); *People v. Simmons* (1978), 58 Ill. App. 3d 1026, 374 N.E.2d 1290 (confession of minor defendant with eighth-grade education and an intelligence score of 80 held voluntary). But see *People v. Redmon* (1984), 127 Ill. App. 3d 342, 468 N.E.2d 1310 (confession of defendant, with intelligence score between 70 to 73, obtained over 19-hour period held involuntary where record showed defendant was confused concerning his rights.)

Another relevant factor in the totality of circumstances is any deception employed by the police officers during the questioning. Defendant specifically complains that Wilkosz lied to him when, after the polygraph examination, he confronted defendant with a document that Wilkosz said was a statement from Spreitzer implicating defendant. Sam admitted this deception, and the State acknowledges to this court that Wilkosz' statement was untrue. Defendant also claims he was lied to by Millner about the results of his polygraph examination. Millner testified at the suppression hearing that he was uncertain whether he told defendant that he had failed the examination. The actual results of defendant's polygraph examination, according to Millner, were inconclusive.

■■ Deception does not invalidate a confession as a matter of law, and its presence in the record, while relevant, is only one factor considered in the determination of voluntariness. (*People v. Martin* (1984), 102 Ill. 2d 412, 427, 466 N.E.2d 228, 234, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334. See generally Annot., 99 A.L.R.2d 772 (1965) (admissibility of confession as affected by its inducement through artifice, deception, trickery, or fraud).) *Martin* presents facts which are very similar to the case at bar. During the State's questioning of the defendant, the assistant State's Attorney told the defendant, Martin, who had not graduated from high school but was literate, that another participant in the crime had identified the defendant as the one who shot the victim. A similar strategy was used here where defendant was shown a certain document and was told it contained the confession of Spreitzer implicating defendant.

The *Martin* court concluded that while the assistant State's Attorney knew the statements were false when initially made, the deception was insufficient to render an otherwise voluntary confession involuntary. An even stronger case can be made for the voluntariness of defendant's statements here, for in *Martin* the defendant's statement was given immediately after the deception was communicated to him. (*People v. Martin* (1984), 102 Ill. 2d 412, 417, 466 N.E.2d 228, 230.) In contrast, prior to Wilkosz' statement to defendant, defendant had already told Millner that he was present when Borowski was

killed. Therefore, unlike in *Martin,* it cannot be fairly said here that defendant had not incriminated himself prior to the deception.

■ Defendant has not sought to distinguish *Martin.* The decision upon which defendant relies (*People v. Payton* (1984), 122 Ill. App. 3d 1030, 462 N.E.2d 543) and a subsequent decision (*People v. Lee* (1984), 128 Ill. App. 3d 774, 471 N.E.2d 567, *aff'd on other grounds* (1986), 111 Ill. 2d 454, 490 N.E.2d 688), are unpersuasive in light of *Martin.* As was true in *Payton* and *Lee,* the defendant in *Martin* was told a lie and the *Martin* court concluded the confession nonetheless was voluntary after considering the totality of the circumstances. We observe that *Payton* was decided before *Martin* and the holding in *Lee* has been rejected expressly by our supreme court. (*People v. Kashney* (1986), 111 Ill. 2d 454, 467, 490 N.E.2d 688, 693-94.) As we find the circumstances in *Martin* analogous to those here, we conclude the trial court's conclusion that defendant's confession was voluntary is not against the manifest weight of the evidence.

Two other factors considered by Illinois courts in the totality of circumstances are whether the defendant was subjected to any physical punishment and whether he received his constitutional rights. (*People v. Wilson* (1985), 139 Ill. App. 3d 726, 739, 487 N.E.2d 1015, 1025.) Defendant cites to no evidence of physical punishment. Defendant does highlight that he only received a candy bar from 2 p.m. on November 10 until 12 p.m. that same day when he was given a hamburger and french fries. However, the detectives consistently testified that defendant never made a request for food which was not satisfied. Also, defendant never provided evidence concerning the hour of his last meal prior to introducing himself to the detectives during the afternoon of November 10. In any event, the failure to eat a complete meal prior to tendering a statement does not render the statement involuntary and the product of an overborne will. See *People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915.

■ Defendant also emphasizes that he was forced to sleep in an interview room on a mattress with a pillow and blanket and was handcuffed during his sleep to a wire-mesh gate. We note that one officer observed defendant sleeping during the morning of November 11 without handcuffs. Also, the alleged conduct did not occur until after defendant made three of the four statements which he now asserts are involuntary and, thus, could not have affected the voluntariness of those statements. Moreover, as defendant acknowledges, this conduct is not similar in character to beatings and other violent acts which courts have found sufficient to overbear a defendant's will. Once defendant made inculpatory statements regarding certain unsolved

homicides, the police officers had a right to take protective measures to prevent any possible escape by defendant. This limited restriction of defendant's freedom of movement within the interview room does not constitute a form of physical punishment sufficient to render the trial court's ruling denying defendant's suppression motion contrary to the manifest weight of the evidence.

■■ The record also supports the conclusion that defendant received his constitutional rights. Defendant first received his *Miranda* warnings, from Millner, following the conclusion of the polygraph examination at approximately 7 p.m. Millner informed Sam at that time that defendant had just received his *Miranda* warnings following the examination. Defendant also received his *Miranda* warnings at 10:30 p.m. on November 10, 1982, prior to his statement regarding the Linda Sutton homicide. In addition to receiving the Miranda warnings, defendant was told on the afternoon of November 10 upon the arrival at the Villa Park police station that he was free to leave. In fact, Wilkosz stated defendant repeatedly was told at the Villa Park station that he was free to use the telephone. Sam testified defendant was free to leave until defendant implicated himself during the polygraph examination. Moreover, defendant readily agreed to the polygraph examination and was advised immediately prior to the test that his submission was entirely voluntary. As defendant received his *Miranda* warnings on several occasions and submitted to the polygraph examination voluntarily, we find no basis for concluding that defendant was not apprised of his constitutional rights. Examining the totality of the circumstances, we cannot conclude that the trial court's ruling denying defendant's motion to suppress is against the manifest weight of the evidence.

■■ Defendant next argues that the trial court erred in excluding the statements made by Andy and Spreitzer to the police when they were arrested several days prior to defendant's arrest in November 1982. Neither Spreitzer nor Andy mentions defendant in any of his confessions, and neither was asked by the police officers conducting the questioning whether defendant was involved in the abductions of Sutton and Borowski. Defendant asserted to the trial court and reasserts on appeal that the statements qualified for admission as against penal interest. The State responds that the trial court properly excluded the statements as hearsay not subject to any exception.

The general rule in Illinois is that extrajudicial declarations by the declarant not under oath that he, and not the defendant on trial, committed the crime are inadmissible as hearsay though the declarations are against penal interest. (*People v. Bowel* (1986), 111 Ill. 2d 58, 66,

488 N.E.2d 995, 999.) Statements against penal interest may be admitted, however, where justice requires. (*People v. Bowel* (1986), 111 Ill. 2d 58, 66, 488 N.E.2d 995, 999, citing *People v. Lettrich* (1952), 413 Ill. 172, 178, 108 N.E.2d 488, 492.) The trial court's ruling excluding statements against penal interest will not be reversed absent an abuse of discretion. (*People v. Bowel* (1986), 111 Ill. 2d 58, 68, 488 N.E.2d 995, 1000.) The question to be considered in judging the admissibility of a declaration of this character "is whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." 111 Ill. 2d 48, 67, 488 N.E.2d 995, 1000.

In enunciating the indicia-of-trustworthiness standard, the *Bowel* court interpreted the four factors cited by the Supreme Court in *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, as merely indicia of trustworthiness in that case and not as requirements for the admissibility of statements against penal interest generally. Prior to *Bowel*, many Illinois courts, in affirming orders excluding from evidence third-party extrajudicial statements, often mechanistically applied the four *Chambers* factors as a conjunctive test for admissibility. *People v. Powell* (1985), 139 Ill. App. 3d 701, 709, 487 N.E.2d 719, 725; *People v. Newell* (1985), 135 Ill. App. 3d 417, 427, 481 N.E.2d 1238, 1246; *People v. Nally* (1985), 134 Ill. App. 3d 865, 871, 480 N.E.2d 1373, 1378; *People v. Williams* (1985), 131 Ill. App. 3d 597, 606, 475 N.E.2d 1082, 1088; *People v. Bowel* (1985), 129 Ill. App. 3d 940, 944, 473 N.E.2d 962, 965, *rev'd* (1986), 111 Ill. 2d 58, 488 N.E.2d 995; *People v. Cunningham* (1984), 130 Ill. App. 3d 254, 264-65, 473 N.E.2d 506, 514; *People v. Martinez* (1984), 129 Ill. App. 3d 145, 164-65, 472 N.E.2d 464, 477; *People v. Bonilla* (1983), 117 Ill. App. 3d 1041, 1043, 453 N.E.2d 1322, 1324; *People v. Petrovic* (1981), 102 Ill. App. 3d 282, 290, 430 N.E.2d 6, 12; *People v. Bell* (1981), 96 Ill. App. 3d 857, 867, 421 N.E. 1351, 1359-60; *People v. Bracey* (1981), 93 Ill. App. 3d 864, 872-73, 417 N.E.2d 1029, 1036; *People v. Garza* (1981), 92 Ill. App. 3d 723, 736, 415 N.E.2d 1328, 1339; *People v. Lomax* (1980), 89 Ill. App. 3d 651, 660, 411 N.E.2d 1212, 1218-19; *People v. Black* (1980), 80 Ill. App. 3d 116, 120-21, 399 N.E.2d 647, 650; *People v. Foster* (1978), 66 Ill. App. 3d 292, 294-95, 383 N.E.2d 788, 790; *People v. Woodruff* (1978), 62 Ill. App. 3d 949, 952-53, 379 N.E.2d 907, 910; *People v. Pietrzyk* (1977), 54 Ill. App. 3d 738, 747, 369 N.E.2d 1299, 1305; *People v. Bolden* (1977), 53 Ill. App. 3d 848, 851, 368 N.E.2d 1319, 1325; but see *People v. Ireland* (1976), 38 Ill. App. 3d 616, 621-22, 348 N.E.2d 277, 281 (where court raised question whether the declarant's unavailability for cross-examination

was sufficient to exclude her statements from evidence). See generally Annot., 92 A.L.R.3d 1164 (1979) (admissibility, as against interest, in criminal case of declaration of commission of criminal act).

Despite the abundance of case law affirming rulings excluding such statements, we have found no decision which has analyzed the admissibility of a third-party extrajudicial statement subsequent to our supreme court's articulation of the indicia-of-trustworthiness standard in *Bowel*. We therefore proceed to determine the admissibility of the statements of Andy and Spreitzer excluded by the trial court in the case at bar mindful that the majority of earlier decisions excluded such statements premised upon then prevailing view—since rejected in *Bowel*—that each *Chambers* factor is a prerequisite to admissibility.

The Supreme Court in *Chambers* reversed the defendant's conviction where an out-of-court confession by a third party was excluded from evidence by the trial court. In reversing the conviction, the court recited four factors which it concluded indicated the trustworthiness of the out-of-court statements: (1) the out-of-court statements were made spontaneously to a close acquaintance of the declarant shortly after the murder had occurred; (2) each out-of-court statement was corroborated by some other evidence in the case; (3) the confessions were incriminatory and against penal interest; and (4) the declarant was present in the courtroom, was under oath, and could have been cross-examined by the State. *Chambers v. Mississippi* (1973), 410 U.S. 284, 300-01, 35 L. Ed. 2d 297, 312, 93 S. Ct. 1038, 1048-49.

In its written order filed on May 4, 1984, the trial court here ruled that the statements were inadmissible because "of the failure of each of the subject statements to meet all four requirements for admissibility as against penal interest" enunciated in *Chambers*. The court's ruling obviously was predicated on the decisions of Illinois courts prior to *Bowel* that each of the four *Chambers* factors had to be satisfied before a hearsay statement could be admissible as against penal interest. In light of *Bowel*, the trial court here applied too stringent a test for the admissibility of the statements. The court expressly found two of the four *Chambers* factors absent here: (1) the statements were made long after the crime occurred and were made to law-enforcement personnel, and (2) the statements likely were not incriminatory. Because application of the four factors does not involve credibility determinations which would more appropriately be made by the trial court, because the court provided its views as to two of the four *Chambers* factors in its order, and because the interests of judicial economy weigh in favor of determining here whether the state-

ments are admissible, we do not remand this cause for reconsideration in light of *Bowel.* Instead, we proceed to determine whether the statements are admissible based upon the *Chambers* indicia of trustworthiness discussed in *Bowel* and other factors recognized by Illinois courts.

The first factor relied upon by the *Chambers* court in reversing the defendant's conviction because of the exclusion at his trial of an out-of-court declarant's confession was that the confession was made spontaneously to a close acquaintance shortly after the murder occurred. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 300, 35 L. Ed. 2d 297, 312, 93 S. Ct. 1038, 1048.) Many Illinois decisions before *Bowel* affirmed the orders of trial courts excluding such statements because the statements were made either to someone other than a close friend or were made some time after the crime had occurred. *People v. Tate* (1981), 87 Ill. 2d 134, 429 N.E.2d 470 (admission occurred two months after crime); *People v. Nally* (1985), 134 Ill. App. 3d 865, 480 N.E.2d 1373 (statement made after completion of defendant's first trial); *People v. Cunningham* (1984), 130 Ill. App. 3d 254, 473 N.E.2d 506 (statement made 17 months after the crime to a defense investigator); *People v. Martinez* (1984), 129 Ill. App. 3d 145, 472 N.E.2d 464 (statement made after defendants were convicted of the crime); *People v. Bonilla* (1983), 117 Ill. App. 3d 1041, 453 N.E.2d 1322 (statement made to a police officer); *People v. Petrovic* (1981), 102 Ill. App. 3d 282, 430 N.E.2d 6 (statement made "quite some time" after the crime); *People v. Bracey* (1981), 93 Ill. App. 3d 864, 417 N.E.2d 1029 (statement made to police officers); *People v. Garza* (1981), 92 Ill. App. 3d 723, 415 N.E.2d 1328 (statement made several years after crime occurred to police officers); *People v. Black* (1980), 80 Ill. App. 3d 116, 399 N.E.2d 647 (statement made to police officer).

The statements in the case at bar were not made spontaneously soon after the crime occurred and were not made to close friends, but instead were made some time after the crime to law-enforcement personnel. In light of *Bowel,* however, the failure of a statement to satisfy this requirement alone does not preclude admissibility. (*People v. Bowel* (1986), 111 Ill. 2d 58, 67-68, 488 N.E.2d 995, 1000.) Moreover, while the statements here do not satisfy the first *Chambers* factor, this failure does not raise a presumption of untrustworthiness. In fact, like the statement in *Chambers*, these statements also are trustworthy, although for a different reason. The court in *Chambers* concluded a statement to a close friend was more likely to be trustworthy; here the statements of Andy and Spreitzer made to a State's

Attorney and police officers while in custody were more likely trustworthy because they tended to intensify police efforts to prosecute Andy and Spreitzer. Like the declarant in *Chambers*, neither Andy nor Spreitzer stood to benefit by disclosing his role in the offenses, and each "must have been aware of the possibility that disclosure would lead to criminal prosecution." (*Chambers v. Mississippi* (1973), 410 U.S. 284, 301, 34 L. Ed. 2d 297, 312, 93 S. Ct. 1038, 1048.) Given the obvious inculpatory character of the statements made by both declarants while in custody to the law-enforcement personnel, these statements are more likely than not to be trustworthy.

The second factor enumerated in *Chambers* is that the confessions were corroborated by some other evidence in the case. Both Spreitzer and Andy made statements regarding the deaths of a white woman and a black woman. In his statement regarding the white victim, which both defendant and the State treat as pertaining to Borowski, Spreitzer stated he went to sleep in the back of a van driven by Gecht and awoke to find the van in a cemetery. He then saw Gecht appear to stab a girl, and later Gecht returned to the van holding a breast which he had removed from the victim. Two facts are corroborated by this statement: (1) the body of the victim was located in a cemetery, and (2) the stabbing is consistent with the testimony of the physical anthropologist, who concluded the circular wounds which he found on the victim's back were caused by a small circular object like an ice pick. In contrast, defendant in his confession stated the victim was killed with an ax. It must be noted that defendant stated Gecht was not present at the victim's death, while Spreitzer implied Gecht alone killed the victim.

In Andy's confession on November 9, 1982, he identified a photograph of the victim as the woman he and Spreitzer abducted from a parking lot off Route 83 in Elmhurst one spring morning. They forced the woman into a van and later stabbed and beat her and dragged her body into some weeds. This testimony corroborates the testimony of the anthropologist that the victim was stabbed. Also corroborated is the location of the abduction, the location of the body (in a weeded area of the cemetery), and the time of year and the time of day when the victim was abducted. Moreover, Andy identified the photograph of the victim.

Spreitzer also talked about the murder of a black prostitute (Sutton) in May 1981, the same homicide utilized against defendant as "other crimes" evidence. Spreitzer stated he and Gecht went riding in Chicago in Gecht's van, picked up a black prostitute, and drove her back to a location around Route 83 and North Avenue, near the Brer

Rabbit Motel. Gecht handcuffed the woman behind her back and took her into some bushes and trees. Five minutes later, Spreitzer heard a loud moaning sound and someone yelling for help. He then heard Gecht whistle and saw that Gecht, who was armed with a knife, had cut off one of the woman's breasts. Gecht then directed Spreitzer to get some wire from the van. Gecht took the wire, wrapped it around the woman's other breast and cut it off.

Andy also confessed to involvement in the Sutton homicide. Andy stated the murder occurred in May 1981. The black girl was picked up in Chicago, and then Gecht drove the van to the Brer Rabbit Motel in Villa Park. Gecht took the girl into some bushes near the motel, and after engaging in sex with her, Gecht struck her repeatedly with a small hatchet.

While these statements arguably are inconsistent in that each declarant claimed to be the person with Gecht when the black prostitute was killed, each statement does corroborate certain facts in the case. Spreitzer's statement that Sutton was handcuffed behind her back is consistent with the testimony at the sentencing hearing of Michael F. Pope, Jr., of the Du Page County sheriff's office crime laboratory that in June 1981 he discovered a female corpse in a field in the vicinity of Brer Rabbit Motel. The woman appeared to be lying face down with her hands behind her back, and handcuffs were attached to the wrist area of her body. Spreitzer, in his statement, also identified a knife in the possession of the police as that which was used in the Sutton homicide.

Andy's statement that the murder occurred on May 24, 1981, corroborates the report of Dr. Greenberg of the University of Illinois Medical Center that determined the date of Sutton's death to be on or about May 24, 1981. Andy's statement that the murder occurred behind the Brer Rabbit Motel also corroborated the location where Sutton's body was discovered. As did the statement in *Chambers*, therefore, the statements of Andy and Spreitzer in the case at bar corroborate facts in the record.

The third factor relied upon in *Chambers* was that the statements were "in a very real sense self-incriminatory and unquestionably against interest." (*Chambers v. Mississippi* (1973), 410 U.S. 284, 301, 35 L. Ed. 2d 297, 312, 93 S. Ct. 1038, 1048.) The trial court here expressly doubted whether the statements were incriminatory, and the State maintains in this court that the statements are not incriminatory. No credible argument can be made that Andy's statement regarding the victim's murder is not against penal interest. Andy identified the victim's photograph and stated he and Spreitzer stabbed and

beat the victim. Spreitzer's statement and to some degree Andy's statement regarding the Sutton homicide also are incriminatory. More troublesome is Spreitzer's statement regarding the murder. According to Spreitzer, he awoke in the back of the van and observed Gecht stab a woman. He walked over to Gecht, who told Spreitzer to return to the van. Spreitzer complied, and then Gecht returned to the van with the breast. After driving to Gecht's home, Spreitzer observed Gecht cut the breast into pieces which he threw away. These statements are incriminatory because they place Spreitzer at the scene and because they confirm that the woman was murdered. A reasonable person admitting these facts would recognize that the statements would intensify police efforts and would focus their investigation in his direction so as to implicate him in the crime.

Spreitzer's statements regarding the Borowski homicide are made more incriminatory by his statement, given at the same time as his Borowski statement, of his involvement in the Linda Sutton homicide. Sutton was murdered one year prior to Borowski, and according to Spreitzer, the murder occurred after Gecht picked up Sutton while Spreitzer remained in the back of the van. Spreitzer in his statement regarding Borowski's murder related similar facts; he admitted that he and Gecht were driving all night in the van looking for a girl. Given his involvement with the Sutton homicide under similar circumstances, a reasonable inference is that he was fully aware that Gecht planned a similar abduction and murder and that he was thus accountable for the murder which later occurred. Therefore, we reject the State's argument and instead conclude the statements of Andy and Spreitzer are incriminatory and were so when made by the declarants.

The fourth factor explained by the court in *Chambers* was that the declarant was present in the courtroom and had been under oath. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 301, 35 L. Ed. 2d 297, 312, 93 S. Ct. 1038, 1049; *People v. Craven* (1973), 54 Ill. 2d 419, 429, 299 N.E.2d 1, 6; *cf.* Annot., 43 A.L.R.3d 1413 (1972).) Here, both parties apparently agree that Andy and Spreitzer would have invoked their fifth amendment rights and would have elected not to testify. In *People v. Bowel* (1986), 111 Ill. 2d 58, 68, 488 N.E.2d 995, 1000, the court found it significant that the declarant was unavailable to be cross-examined. (See also *People v. Nally* (1985), 134 Ill. App. 3d 865, 480 N.E.2d 1373; *People v. Cunningham* (1984), 130 Ill. App. 3d 254, 473 N.E.2d 506; *People v. Garza* (1981), 92 Ill. App. 3d 723, 415 N.E.2d 1328; *People v. Ireland* (1976), 38 Ill. App. 3d 616, 348 N.E.2d 277.) As the *Bowel* court stated, however, the declarant's unavailabil-

ity is only one relevant factor in determining the trustworthiness of the statement. The unavailability of Andy and Spreitzer to testify, therefore, does not preclude admissibility of their statements.

In addition to the factors enunciated in *Chambers*, our supreme court in *People v. Lettrich* (1952), 413 Ill. 172, 108 N.E.2d 488, isolated several additional facts which it found significant in reversing a conviction where an out-of-court confession of another was excluded from evidence. In several respects the facts in *Lettrich* parallel those here. The victim's body was found some time prior to the arrest of the defendant, who initially denied responsibility for the offense. As here, the defendant took a polygraph test. Both defendants underwent a multiday interrogation, although the defendant in *Lettrich* gave and signed his written statement after three days of questioning, while here defendant gave his statement regarding the Borowski murder after only several hours of questioning. Both defendants later recanted their confessions as involuntary, although the defendant in *Lettrich* additionally alleged he was threatened and beaten prior to offering his confession. In *Lettrich*, as here, the court concluded that the confession of the defendant was voluntary.

Despite the voluntariness of the confession, however, the *Lettrich* court reversed the defendant's conviction and ordered a new trial because of the trial court's ruling excluding the testimony of the director of a behavior clinic that another person had confessed this same murder to the director. While acknowledging the general rule that an extrajudicial statement such as that relayed to the director is hearsay and thus normally inadmissible, the *Lettrich* court found special circumstances justifying a departure from the general rule.

Many of these circumstances exist in the case at bar. First, the State in *Lettrich*, as it did here, relied upon a confession which the defendant alleged was involuntary. Second, the confession of the defendant in *Lettrich* did not coincide with many of the known facts. Here, as defendant emphasizes, his confession in several respects does not comport with facts in the record. In his confession, defendant stated the victim was killed with an ax, which arguably contradicted the anthropologist's testimony that the victim was stabbed with an implement similar to an ice pick. Defendant also confessed that the victim was murdered and her breast removed in the motel room. Testimony from the maid and from the owner of the motel indicated no excessive amounts of blood or missing sheets were observed during May 1982 when the victim was killed. Defendant stated the victim was killed with her clothes removed; examination of the remains revealed that her blouse was ripped apparently by the same weapon

which caused the wounds in the victim's back. Noting the variance between the defendant's confession and the facts, the *Lettrich* court stated that "justice requires that the jury consider every circumstance which reflects upon the reliability of that confession, and a confession of a third person that he perpetrated the offense is such a circumstance." *People v. Lettrich* (1952), 413 Ill. 172, 179, 108 N.E.2d 488, 492.) Likewise, in the case at bar, the State's prosecution was grounded in defendant's confession which was at variance with certain facts in the record.

█ Another factor noted in *Lettrich* which is equally true here is that there was no suggestion that the defendant induced the confession of the third party. Also, like here, the *Lettrich* court found the exclusion of the evidence more damaging because the confession was virtually the only evidence of guilt introduced by the State. The State unpersuasively distinguishes *Lettrich* on the basis that the third-party confession was made to a social worker there, while here the third-party confessions were made to the police. The State does not explain why this distinction should preclude admissibility, and we find no reason on these facts to conclude that the incriminatory statements to the police officers were untrustworthy. We therefore conclude based upon the factors discussed in *Chambers, Bowel,* and *Lettrich* that the trial court abused its discretion in excluding the statements of Andy and Spreitzer. Also, we reject the State's argument that *Lettrich* is unpersuasive because it was decided 20 years before *Chambers.* As the court in *Chambers* was not attempting to fashion a test for admissibility, but rather was simply emphasizing facts which suggested trustworthiness in that case, we read *Chambers* and *Lettrich* as consistent.

█ Although the State argues that exclusion of the statements constitutes harmless error beyond a reasonable doubt, we find its argument unpersuasive. The State emphasizes that the jury learned through the testimony of the detectives that defendant had been lied to when he was told that Spreitzer had implicated him. The detectives later testified Spreitzer had not mentioned defendant in his statement. In no way can these isolated remarks be equated with the introduction of statements by Andy and Spreitzer concerning the Borowski homicide which fail to mention defendant. Where the State's case rested upon defendant's confession and where third-party statements against the declarants' penal interests existed but were excluded from the jury's consideration, we cannot agree with the State that their exclusion constitutes harmless error beyond a reasonable doubt.

In reaching our conclusion that the trial court's exclusion of the

statements is reversible error, we do not overlook certain facts: (1) that defendant's confession is consistent with certain facts in the record; (2) that the statements of Andy and Spreitzer arguably are inconsistent with one another in some significant respects; and (3) that the failure of both statements to implicate defendant arguably can be explained on the basis that Andy and Spreitzer were aware that defendant's identity was not known to the officers at the time they gave their confessions. While these factors properly are considered by the jury in determining the credibility of defendant's confession, they do not warrant exclusion in this case of the statements of Andy and Spreitzer where defendant's confession is the main evidence linking defendant to the crime. Accordingly, we reverse defendant's conviction and remand this cause for a new trial.

■■■ Defendant also asserts that his rape conviction must be reversed because the State failed to present evidence corroborating his confession regarding the charge of rape. In order for a conviction based upon a confession to be sustained, the confession must be corroborated. (*People v. Willingham* (1982), 89 Ill. 2d 352, 358-59, 432 N.E.2d 861, 864.) Two reasons commonly are cited for this requirement: (1) confessions are unreliable if coerced; and (2) persons often confess for various psychological reasons to crimes that either have never occurred or for which they are not legally responsible. *People v. Dalton* (1982), 91 Ill. 2d 22, 29, 434 N.E.2d 1127, 1131; *In re D.A.* (1983), 114 Ill. App. 3d 522, 524, 448 N.E.2d 1036, 1038.

The corroboration requirement is satisfied by proof of the *corpus delicti*. (*People v. Willingham* (1982), 89 Ill. 2d 352, 359, 432 N.E.2d 861, 864.) The *corpus delicti* is not required to be proved beyond a reasonable doubt exclusively by evidence independent of the confession, nor must it be established by evidence other than that which tends to connect the defendant with the crime. (89 Ill. 2d 352, 359, 432 N.E.2d 861, 864.) Rather, if evidence is presented which tends to prove that the offense occurred, then that evidence, if it corroborates the facts contained in the defendant's confession, may be considered together with the confession to establish the *corpus delicti*. *People v. Lambert* (1984), 104 Ill. 2d 375, 379, 472 N.E.2d 427, 429.

To establish the crime of rape, the State had to prove that defendant or one for whose conduct defendant was legally responsible: (1) was 14 years or older; (2) had sexual intercourse with the victim who was not his wife; (3) forcibly and against her will. (Ill. Rev. Stat. 1981, ch. 38, par. 11—1.) Defendant argues that the record contains no evidence independent of the confession tending to prove the commission of the rape. We agree.

The State essentially makes two arguments in support of the rape conviction. First, the State contends the independent evidence in the record here is sufficient to corroborate defendant's confession. The State characterizes the testimony of its expert, in conjunction with photographs of the victim, as evidence that the victim's left breast had been removed, thereby "establishing that the abduction was perversely sexual in character." In fact, however, the witness testified that he detected no trauma or man-made mutilation of the skin on the corpse. The missing skin, which ended two inches below where the left nipple would have been, was destroyed because of chemical and insect decomposition. Although he allowed that a clean cut of the left nipple was possible, his examination revealed no signs of trauma in that area. Contrary to the State's characterization, therefore, this testimony and the photographs are not independent evidence tending to establish the commission of the rape.

The State also emphasizes the testimony that the victim's pants when found on the body were separated at the inseam. The State's Exhibit 27, a photograph of the pants found in the cemetery, shows that the pants are split along the inseam from the back to the front along the crotch. The State argues the pants are ripped and, thus, are evidence independent of the confession tending to establish that the offense of rape occurred.

A recent decision by our supreme court (*People v. Lambert* (1984), 104 Ill. 2d 375, 472 N.E.2d 427) illustrates the inadequacy of the evidence here. In *Lambert* the defendant confessed to and subsequently was convicted of the offense of indecent liberties with a four-year-old child. The appellate court reversed, concluding the record contained insufficient evidence independent of the confession to support the conviction. In affirming the appellate court, the supreme court recited the evidence independent of the confession: (1) that the defendant slept in the basement; (2) that the victim slept in the basement on the night in question; and (3) two or three weeks after that night, the victim's rectum appeared pinkish and swollen.

The court observed that the record contained no evidence linking the condition of the victim's rectum with the incident almost two weeks earlier. In the case at bar, the victim was murdered on May 15, 1982, and her body was not discovered in the cemetery until October 10, 1982. Obviously, the significance of a ripped inseam exposed to the elements and found five months after the abduction is even less certain than was the discovery in *Lambert* of the pinkish rectum several weeks after the night both the defendant and the victim slept in the basement.

Two additional cases, in which the courts found sufficient evidence independent of the confession to affirm the convictions, profitably are contrasted against the paucity of independent evidence here. In *People v. Perfecto* (1962), 26 Ill. 2d 228, 186 N.E.2d 258, the defendant sought reversal of his conviction because no evidence existed *aliunde* the confession for the rape offense. The *Perfecto* court disagreed, finding the independent evidence in the form of the testimony of a witness who offered the following rendition of the events that night. The defendant, on the evening in question, left his room and returned holding a handkerchief to his face. Later, the witness left the room, returned, found the defendant gone, went to the washroom, and noticed the lights in the victim's room go on and off and the door shake. Watching the victim's door, the witness observed the defendant emerge a short time later. The defendant's left shoulder was scratched, and a bite mark was apparent in his right shoulder. A red smear was present on the wall in the room where the offense occurred, and blood was flowing from the victim; her body was bruised, and her collarbone was broken.

The substantial evidence in *Perfecto* distinguishes that case from the instant case. Here, the only evidence which is cited by the State as indicative that a rape occurred is that the victim's pants were separated at the inseam when found five months after the victim's death. While the State is correct that the evidence in *Perfecto* did not prove the element of penetration, the evidence there taken as a whole, as the *Perfecto* court stated, left no doubt that a rape was committed and that defendant committed it. (*People v. Perfecto* (1962), 26 Ill. 2d 228, 230, 186 N.E.2d 258, 259.) The separated inseam falls far short of the evidence relied upon by the court in *Perfecto*.

The facts in *People v. Darnell* (1981), 94 Ill. App. 3d 830, 419 N.E.2d 384, likewise provided evidence *aliunde* the confession that the rape occurred. In *Darnell*, like here, the defendant was charged with and convicted of both rape and murder. In addition to the defendant's confession regarding both crimes, the record contained two relevant photographs: one showing apparent penile abrasions on the defendant's genitalia and the other showing the partially exhumed body of the victim with her shorts pulled down below her buttocks. The appellate court affirmed the defendant's conviction for rape, finding that those two photographs provided sufficient corroborative evidence independent of the confession.

Certain facts in *Darnell* were especially significant. Since the body was found one day after the rape, the location of the victim's shorts fairly tended to corroborate the rape. Here, the separated

inseam found five months after the death is far less probative. Also, the photograph of defendant's genitalia served both as evidence that penetration had occurred and that the defendant was the person who engaged in the intercourse. Our review of decisions where the independent evidence was found lacking and where the independent evidence was determined to corroborate the confession convinces us that the record here lacks the independent evidence of the rape necessary to corroborate the defendant's confession.

The second argument raised by the State is that it need not have introduced independent evidence of the rape offense because the *corpus delicti* of the murder offense was established *aliunde* the confession. Once defendant's confession is shown to be trustworthy through independent evidence of the murder, the State argues, the confession should be admissible to prove the *corpus delicti* of the rape without independent corroborative evidence. Defendant responds that each offense must be corroborated by independent evidence before the confession can serve as evidence against him.

Neither party has cited and our research has not disclosed any Illinois cases discussing this question. Nonetheless, two decisions inferentially support defendant's position. (*People v. Neal* (1985), 111 Ill. 2d 180, 489 N.E.2d 845, *cert. denied* (1986), 476 U.S. 1165, 90 L. Ed. 2d 733, 106 S. Ct. 2292; *People v. Darnell* (1981), 94 Ill. App. 3d 830, 419 N.E.2d 384.) In *Darnell*, like here, the body of the victim was discovered—the investigating officers found it buried in a shallow grave—and, thus, no doubt existed that the *corpus delicti* of the murder was established independent of the confession. Nonetheless, the *Darnell* court proceeded to examine the record for independent evidence on the rape charge. Were independent evidence of the murder sufficient to allow admission of the confession for all offenses, the *Darnell* court could simply have reviewed the facts establishing the *corpus delicti* of the murder offense.

Similarly, in *Neal*, the defendant was charged with and convicted of murder and armed robbery. Like here, the defendant confessed to both crimes and on appeal sought reversal of his armed-robbery conviction on the ground that the record contained no evidence independent of the confession which tended to establish the *corpus delicti* of the armed robbery offense. As was true here, the defendant did not assert that the *corpus delicti* for the murder had not been established by evidence *aliunde* his confession, apparently because the victim's body was found at the scene of the crime with 17 blunt trauma lacerations evident on the victim's head. In affirming the defendant's armed-robbery conviction, the *Neal* court reviewed the

record and found sufficient independent evidence of the armed robbery to allow use of the defendant's confession for that offense. Were the State correct in asserting that independent corroboration of a confession for one offense allows use of that confession as evidence of other offenses for which the independent evidence is insufficient, then the *Neal* court could have resolved the appeal more easily simply by reciting the independent proof of the *corpus delicti* for the murder and then using the same confession as proof of the armed robbery. We recognize that the courts in both *Neal* and *Darnell*, when analyzing the evidence of the *corpus delicti* of the challenged offenses, were not required to decide the precise issue raised by defendant here. Nonetheless, we find their dispositions on analogous facts supportive of our conclusion that independent evidence of one offense does not allow use of a defendant's confession for all crimes for which the defendant is charged regardless of whether or not independent evidence of the other crimes exists in the record.

The State's reliance on *People v. Jordan* (1983), 114 Ill. App. 3d 16, 448 N.E.2d 237, *aff'd on other grounds* (1984), 103 Ill. 2d 192, 469 N.E.2d 569, is unavailing. The State cites *Jordan* as a case supporting its argument that independent corroboration of one offense allows use of the confession for other offenses. In fact, *Jordan* is implicit authority for the contrary position. The defendant in *Jordan* was convicted of felony murder and kidnaping. As the State acknowledges, the record contained sufficient evidence independent of the confession establishing the *corpus delicti* of the murder. Defendant on appeal asserted the record contained no evidence independent of the confession regarding the kidnaping. In affirming the conviction for kidnaping, the court did not rely upon the independent evidence of the murder but instead considered the independent evidence of the kidnaping. Moreover, the independent evidence did tend to establish the kidnaping. While the specific statutory kidnaping section is not recited in *Jordan*, it would appear that the defendant was convicted on the basis of section 10—1(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 10—1(a)(3)), which states a person commits the act of kidnaping when, by enticement, he knowingly induces another to go from one place to another with intent secretly to confine the person against his will. According to the defendant's confessions, the plan was to entice the victim to leave the bar on the premise of smoking marijuana outside so that the defendant with his accomplices could then murder the victim. The independent evidence recited by the court was that the victim was observed leaving the bar with one of the accomplices and that her remains and clothing were located at

another site. (*People v. Jordan* (1983), 114 Ill. App. 3d 16, 25, 448 N.E.2d 237, 243-44.) On these facts, the *Jordan* court correctly found that this evidence independent of the confession corroborated the kidnaping.

■■■ The State also emphasizes that certain aspects of defendant's confession are confirmed by the record, including his statement of the place where the victim was abducted, his description of the car used, and his description of the cemetery where the body was deposited. None of these facts, however, tends to establish that the offense of rape occurred. *Cf. People v. Davis* (1957), 10 Ill. 2d 430, 441, 140 N.E.2d 675, 683, *cert. denied* (1957), 355 U.S. 820, 2 L. Ed. 2d 35, 78 S. Ct. 25 (to establish the *corpus delicti* in forcible rape, it is necessary to show that a male at least 14-years-old had carnal knowledge of a female forcibly and against her will).

Defendant also makes two arguments regarding his sentencing: (1) that his extended term for rape violated the statute permitting an extended term only for the conviction within the most serious class, and (2) his natural-life term of imprisonment was excessive and disproportionate to defendant's responsibility for the murder. The State in its reply brief conceded error as to the extended-term sentence, and we need not address defendant's second argument in light of our disposition granting defendant a new trial. Accordingly, we affirm the trial court's order denying defendant's motion to suppress his confession as involuntary; we reverse defendant's conviction for murder and remand this cause for a new trial on the murder charge; and we reverse defendant's conviction for rape.

Affirmed in part and reversed in part and remanded.

SCHNAKE, J., concurs.

JUSTICE STROUSE, dissenting:

While I concur with my colleagues' finding that the statements of the defendant were voluntary and that the *corpus delecti* of the rape was not proved, I must respectfully dissent from their decision to remand the cause for a new trial based on the failure to admit the confessions of Andy and Spreitzer. The law permits a confession of another to be admitted in evidence when it is relevant. Since it is an exception to the hearsay rule, it is not admitted until there is a "considerable assurance" of its reliability by objective indicia of trustworthiness. (*People v. Bowel* (1986), 111 Ill. 2d 58, 67.) The dispute with my colleagues specifically centers on the relevancy of these confes-

sions and the application of *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, and *People v. Bowel* (1986), 111 Ill. 2d 58, concerning their admissibility.

A confession of another to a crime is relevant only if it tends to show that the defendant did not commit the crime. Here, the confessions exclude any mention of the defendant and seem to be carefully phrased to avoid mentioning him. Andy's and Spreitzer's statements do not exclude the defendant's participation in this crime. The majority admits that the statements failed to implicate the defendant, but it attempts to explain that Andy and Spreitzer were aware that the defendant's name was not known to the police at the time they confessed and that they did not want to implicate him. That is one of the cogent reasons why their confessions are not only irrelevant as failing to negate the defendant's participation but also are lacking in trustworthiness.

*Chambers* and *Bowel* establish the basic rules of law that govern the admissibility of such confessions in Illinois. The four factors enunciated by the *Chambers* court are considered when determining a statement's admissibility because each factor is an objective indicia of trustworthiness and tends to support the reliability of the hearsay statement. Those four factors seem to be the most common criteria relied upon for determining the "considerable assurance" of reliability upon which the admission of such hearsay statements depends. In this case, the declarations were not made under circumstances that provide "the considerable assurance" of reliability by objective indicia of trustworthiness that is required in both *Chambers* and *Bowel*. (*People v. Bowel* (1986), 111 Ill. 2d 58, 67.) Our supreme court, in deciding *Bowel*, did not find the *Chambers* test invalid but held that all four of the criteria of *Chambers* need not be present. (111 Ill. 2d 58, 67.) Our supreme court did, however, find that "considerable assurance" of reliability by objective indicia of trustworthiness was the principal determination. 111 Ill. 2d 58, 67.

As the majority did, I will examine the *Chambers* criteria in the same order to determine if the record presents enough "considerable assurance" of reliability to admit the confessions. First, the out-of-court statements were not made spontaneously or shortly after the murder occurred. They were made almost six months after the occurrence. Many cases cited in the majority opinion hold that such a lapse of time alone casts considerable doubt on the reliability of the statements. (See, *e.g., People v. Tate* (1981), 87 Ill. 2d 134, 144; *People v. Nally* (1985), 134 Ill. App. 3d 865, 871; *People v. Cunningham* (1984), 130 Ill. App. 3d 254, 264.) Second, the statements were made while

Andy and Spreitzer were in police custody, not to a close acquaintance, casting additional doubt on their reliability. The majority's attempt to find such "considerable assurance" in these statements has been rejected by many cases in Illinois. (See, *e.g.*, *People v. Bonilla* (1983), 117 Ill. App. 3d 1041, 1043; *People v. Petrovic* (1981), 102 Ill. App. 3d 282, 289-90; *People v. Bracey* (1981), 93 Ill. App. 3d 864, 872-73; *People v. Garza* (1981), 92 Ill. App. 3d 723, 735-36; *People v. Black* (1980), 80 Ill. App. 3d 116, 120-21.) *Bowel* does not reverse the "considerable assurance" of reliability aspect of those cases. I would not reverse this substantial body of Illinois authority. Third, while some details of the confessions were corroborated, the confessions were contradictory and inconsistent in critical areas. In my opinion, this detracts from, rather than adds to, their "considerable assurance" of reliability. Fourth, the declarants were not present in the courtroom, were not under oath, and could not have been cross-examined by the State. Counsel's representation that the declarants would not testify is the only record of their unavailability in this case. Such a statement standing alone does not excuse the declarants' presence when required. The majority, in its attempt to excuse Andy's and Spreitzer's presence from testifying, avoids the critical focus of admitting the hearsay statements set forth in *Chambers* and explained in *Bowel*: that the failure to testify in support of their confessions detracts from the "considerable assurance" of reliability.

Bowel* did not reject the *Chambers* tests. *Bowel* simply held that all four of the *Chambers* tests were not necessary, although a "considerable assurance" of reliability is still the principal focus of admissibility. Excusing consideration of one or all of the *Chambers* tests does not provide reliability. Even if all objective indicia of trustworthiness were properly excused, the statements would not be admissible because there would be no objective indicia of reliability to overcome the objections of the hearsay rule. As I read the majority opinion, it has established entirely new criteria for judging the admissibility of such hearsay statements and, in the process, overruled a substantial body of case law which was not reversed by the holdings in *Chambers* and *Bowel*. When I couple the failure of the statements to exclude the defendant from participation in the crime with four missing or seriously impaired indicia of *Chambers*, I find no reliability in the proferred confessions. I would affirm the ruling of the trial court in refusing the confessions.